**FILED**

SEP 15 2022

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

REBECCA R. BIBBS, )
    Plaintiff  , ) Case No._____
)
V. )
) 1 : 22 -cv- 1 8 1 9 SEB-DLP
CNHI, LLC, )
d/b/a The (Anderson,Ind.) Herald Bulletin, )
    Defendant )

## COMPLAINT UNDER TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964., 42 U.S.C. § 1981

### I.  JURISDICTION AND LIABILITY

**COMES NOW,** Rebecca R. Bibbs, Plaintiff *pro se*, who complains of the Defendant, and for her cause of action alleges and says as follows:

1. The District Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1333, which grants federal district courts original jurisdiction over cases arising under the Constitution, laws or treaties of the UNited states. The jurisdiction of the Court over the state-law claims is based on the supplemental jurisdiction statute, 28 U.S.C. § 1367 (a), which extends the jurisdiction of federal district courts to all claims that are sufficiently related to the claim or claims on which their original jurisdiction is based to be part of the same case or controversy within the meaning of Article III of the Federal Constitution.

1

## II. PLAINTIFF

2. Plaintiff is an award-winning newspaper and magazine veteran with 35 years of superior professional performance and experience in journalism, including as a reporter and editor at *The Indianapolis News* and *The Indianapolis Star*, Indiana's largest newspapers by circulation and the state's publications of record; as managing editor at *Indianapolis Woman* magazine, at the time, Indiana's largest consumer magazine by circulation; and as associate editor of the *Indiana Minority Business Magazine*, one of the state's largest publications by, for and about diverse Hoosiers.

3. Plaintiff, who has been an employee of *The Herald Bulletin* and CNHI since April 14, 2015, is an Arthur F. Burns fellow through the International Center for Journalists and has won several first-place awards for a wide range of beats, including education, minority issues and investigative reporting, from a variety of organizations over the years. In 2017, Plaintiff won awards in each of the seven categories — four of them first place — across three contests entered by The Herald Bulletin. Plaintiff also is the winner of the Indiana Historical Society's 2021 Dunn Award,

4. Plaintiff was a member of the teams that led to *The Herald Bulletin* being named CNHI Newspaper of the Year in 2018 and its status as the Hoosier State Press Association's reigning Blue Ribbon Newspaper since 2019. Though not mentioned by name, Plaintiff is the only reporter who worked on the two packages — one of them an individual effort by her — mentioned specifically by judges In the email circulated when *The Herald Bulletin* was named CNHI's Newspaper of the Year.

5. Plaintiff clearly was removed by CNHI Management (Management) March 8, 2021 only from her coverage of Anderson Community Schools because her beats continue to include the 10 other schools and districts serving Madison County

and nearby communities, demonstrating that it is retaliation, not her expertise as a reporter and writer and in covering education that is in question.

6. Plaintiff consistently has been a recipient of *The Herald Bulletin*'s Bee Award.

7. Herald Bulletin Management a s recently as 2022 submitted Bibbs' work to be considered for various contests and paid entry fees, demonstrating confidence in the superiority of her work.

## III. DEFENDANTS

8. Defendant CNHI, LLC, (CNHI) at all times relevant to this action was located at 201 Monroe St., Montgomery, AL, 36104. CNHI is defined as "a leading provider of local news and information, offering a wide array of print and digital products in 22 states,"

9. The (Anderson, Ind.) Herald Bulletin newspaper (Herald Bulletin) at all times relevant to this action was located at 1133 N. Jackson St., Anderson, IN, 46016. The Herald Bulletin is defined as a newspaper serving the Andersin, Ind., community that is part of CNHI's Indiana Newspaper Group.

## III. NATURE OF CLAIM

10. Defendants in their official capacity, acting singularly and in conspiracy, engaged in conduct toward achieving deprivation of Plaintiff's federally protected rights under color of federal and state law. The conduct of the company's agents failed to protect Plaintiff from racial discrimination within and outside the company, subjected Plaintiff to retaliation, and diminished Paintiff's reputation as a

3

journalist in the eyes of the community. The actions surrounding the initial discrimination started February 12, 2021, and the resulting retaliation continues through this date. The Defendants' actions and inactions represent a disregard and total indifference of the Plaintiff's federally and state protected rights, justifying an award of punitive damages in addition to any actual or compensatory damage the Plaintiff is entitled to recover.

## IV. STATEMENT OF FACTS

11. On Feb. 12, 2021, The Herald Bulletin's Executive Editor Scott Underwood (Underwood) directed Plaintiff;s supervisor to speak with her about the use of Lindsay Brown (Brown), who is African-American, as a source for her articles under the specious auspices that she had used him too often as a source at the expense of other possible sources. No data was presented to back up this allegation. Uncomfortable with the discussion and its implications, Plaintiff documented it, responding in writing to specific allegations and their fallacies and sent it to Management, which responded the following day with a telephone discussion. Though sometimes additional sources have been suggested as a normal part of the editing process, this is the second time in Plaintiff's career that she has been told a source has been used too often, the first also regarding Brown back in October 2020. Plaintiff believes both instances were the results of complaints by Diane Airhart (Airhart), an elected member of the Anderson Community Schools Board of Trustees and former wife of The Herald Bulletin's Senior Reporter Ken de la Bastide (de la Bastide). Plaintiff believes both Airhart and de la Bastide identify as white.

12. Plaintiff on March 5, 2020 performed an audit of articles she wrote between Dec. 1, 2020 and Feb. 28, 2021. The articles reviewed were not exhaustive and included only those she deemed of specific interest to the Black community. In addition there may be mainstream articles in which Black people have been

4

mentioned, Black people may be mentioned but not quoted in both types of articles and there may be Black people mentioned or quoted who Bibbs has not seen and does not know to be Black. Here are the results:

A. Brown was mentioned in five of 21 articles. Each of those mentions involved Anderson Community Schools. This is because Plaintiff is education reporter, and though she has about a dozen schools and districts to cover, ACS was a priary part of her expected core coverage. ACS was going through a contentious superintendent search, and Brown was a central community driver in that search.

B. A less exhaustive search of the terms "Ken de la Bastide" and "Lindsay Brown" on The Herald Bulletin's website shows Brown also appears between Dec. 1, 2020 and Feb. 28, 2021 in seven articles by de la Bastide regarding other matters around the City of Anderson. In many, he is just mentioned and does not necessarily take a central role or is used as a source. However, Brown is a main source in a Jan. 20 article written by de la Bastide about an ACS community meeting Plaintiff was not able to cover. To Plaintiff's knowledge, de la Bastide has not been asked to limit his references to or use of Brown as a source.

C. The audit of Bibbs' articles also showed that Tamie Dixon-Tatum (Dixon-Tatum), who is African-American, was used as a source seven times, two more times than Brown. She was as much a critic of the ACS superintendent search process as Brown. However, Management did not mentioned her at all, much less direct Plaintiff to use her as a source less often, bolstering her belief that Underwood's directive is the result of a complaint by a politically motivated member of the public.

D. Though Management implied Plaintiff did not make wide use of other sources in articles about Anderson's Black community, the audit shows Kim Townsend and Rebecca Crumes, were quoted three times and two times, respectively. In addition, 35 other members of the Black community were quoted across the 21 articles.

5

13. Plaintiff considers the questioning of her sourcing in this matter part of an ongoing pattern by Underwood, who repeatedly has questioned her motivations for writing articles, particularly on issues of social and racial justice. This leads Plaintiff to believe that Underwood assumes her reasons for writing these articles are rooted in some personal need or interest based on her race and/or gender rather than that it constitutes good and complete journalism. However, Plaintiff has been inclusive in her reporting throughout her career regardless of the beat and has no particular interest in the outcomes of the issues of Madison County because she neither lives there nor comes from there.

14. Management also tried to assert that Plaintiff's response to Airhart's email to Dixon-Tatum that was forwarded in the hopes of generating a news article was somehow inserting the reporter into the news. Actually, the opposite is true. Plaintiff was telling Airhart there would be no story. Joyce's email seems to imply that Plaintiff somehow became part of the discussion between Airhart and Dixon-Tatum, which is not true. Plaintiff sent her response to Airhart only. Telling potential sources whether there will or will not be a story is a routine part of a journalist's work. But from Plaintiff's standpoint, there was going to be no story, so nothing into which to insert herself. And Plaintiff's decision not to cover Airhart's statement also is the type of decision routinely left at the discretion of reporters. The decision not to take her over the coals is no different than Management's policy not to cover controversial situations involving candidates close to an election. The only way the public became aware of any of this at all was when Management made the decision to reassign Plaintiff and send the reporter who replaced her to speak with her sources.

15. Alexander, who is Black, later told Plaintiff she should not have pointed out the white supremacy of her statement to Airhart.

16. As the Holocaust survivor Elie Wiesel said in his speech when he won the Nobel Prize, "Neutrality helps the oppressor, never the victim. Silence encourages the

6

tormentor, never the tormented. Sometimes we must interfere. When human lives are endangered, when human dignity is in jeopardy, national borders and sensitivities become irrelevant."

17. The Society of Professional Journalists' Code of Ethics calls on us to be a voice for the voiceless. (Exhibit 15) That is precisely what Bibbs has done.

18. The tone policing attempted by Management is discriminatory against Plaintiff in terms of race, culture and gender. Joyce in an email said she and Underwood wanted to talk to Plaintiff about her tone and communication, in effect admitting to wanting to employ a recognized form of racial and gender discrimination. Tone policing is an ad hominem or personal attack rather than one of issue and is one of many ways white employers try to control employees of other races and cultures. Attempts to police Plaintiff's tone are an affront to both her Black and Dutch heritages, both of which are known for their directness,

19. In addition it is a necessity of the profession that journalists use more assertive forms of speech. It is necessary to the sometimes adversarial nature of interactions between journalists and sources, especially as part of their watchdog function in regard to government and its officials, which include people like Airhart. In this instance, tone policing suddenly is an issue when a white government official is offended by the word choices of a Black female reporter, but the tone of that very same complainant's ex-husband, a white male, was not policed when he loudly and in earshot of other people told a government official not to argue with someone who buys ink by the barrel.

20. Management has asserted to Tatum that removing Plaintiff from the coverage of ACS is a business rather than journalistic decision and to Brown that Plaintiff was not removed because of a complaint. Because of her vastly superior knowledge and experience as a former employee of a large urban school district and as a journalist covering education and diversity for some of the state's publications of record as well as *The Herald Bulletin*, there would seem to be no other reason for being removed.

21. Though she has not been reprimanded, Plaintiff has been replaced by a succession of journalist who are less qualified to cover education, starting with Don Knight (Knight), a white male with primary experience and knowledge as a photographer, who was directed by Underwood to make a special effort to introduce himself to Brown and tell him that moving forward, he would be the one to cover ACS and would be talking to him at times even though Plaintiff twice had been told that Brown was being covered too often. After Knight left his position, the ACS beat was given to police reporter Traci Miller; then novice reporter Kylee Mulliken and most recently to Andy KNight, whose experience is primarily sports and business.

22. Plaintiff has made formal request to be restored to the ACS beat, and Management could do so at any time.

23. Though it certainly is true there can be no journalism without money, most credible publications observe a strict separation between business and editorial to avoid conflicts of interest. In that same vein, there is a difference between an advertiser or subscriber and a source. Though she may be a subscriber or even an advertiser, Plaintiff's interaction with Airhart was that of a journalist with a source in her capacity as a government representative.

24. In its clear attempt to placate Airhart, Management is violating the Society of Professional Journalists' Code of Ethics mandate to "Act independently" by failing to "resist internal and external pressure to influence coverage."

25. Management repeatedly fails to balance the editorial operation, which with the exception of Plaintiff, is all white and all male, negatively influencing its managerial operations and its news coverage of a diverse community..

26. Aside from the imposition of white male cultural norms regardless of fairness or effectiveness, Management is so ill-equipped to handle issues of diversity they did not understand EEOC language enough to respond to it appropriately. Plaintiff repeatedly asked that Dixon-Tatum, the original author of the letter to which Airhart responded, be

allowed in any meeting to help Management understand the racial nuances of the situation as it related to Plaintiff. Those requests at first were rebuffed before eventually being denied. Rather than backing off when Plaintiff said she felt the issues revolved around race and gender and when she used the term "hostile environment" they doubled down on their harassment and threatened termination. It wasn't until Alexander actually read the exchanges between Management and Plaintiff that the harassment by Management ceased.

## V. LEGAL CLAIMS

Plaintiff reiterates and incorporates by reference each and every allegation heretofore set forth as a part hereto.

## VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964,, 42 U.S.C. § 1981

27. Defendant, CNHI, d/b/a The Herald Bulletin and their agents not only failed to protect Plaintiff from racial discrimination by someone outside the company, they aided and abetted her in her discriminatory act by removing her from her beat.

28. By ot restoring Plaintiff to the ACS beat after repeated requests, CNHI, *The Herald Bulletin* and their agents have subjected Plaintiff to retaliation.

29. Because of the public nature of her work, it was very apparent to the community that Plaintiff was removed from her beat. That has diminished Plaintiff;s reptation and left some officials believing they need not respond to Plaintiff's requests for information, reducing her effectiveness as a journalist.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, Rebecca R. Bibbs, respectfully prays that this COUrt afford the following relief:

A. Declare that the acts of the Defendant described herein violated Plaintiff's rights uder the Constitution and laws od=f the United States,
B. Enter an order awarding damages in favor of Plaintiff necessary to make her whole, including the cost of this actio and related fees, as allowed by law.
C. Order a schedule to establish dates for the completion of discovery and other pre-trial procedures, including a date set for jury trial.
D. Enter an order granting Plaintiff declaratory judgment as to some of her claims.
E. Order any such additional relief as this Court ay deem just and proper.

Respectfully submitted,

*Rebecca R. Bibbs*
Rebecca R. Bibbs
440 N. 12th St.
New Castle, iN 47362

## **VERIFICATION**

I, Rebecca R. Bibbs, herby verify under the penalty of perjury that the facts, dates and contents of the foregoing Plaintiff's COMPLAINT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,, 42 U.S.C. § 1981 and attached documents are authentic, true and correct to the best of my knowledge, sworn this 13th day of September 2022.

*Rebecca R. Bibbs*
Rebecca R. Bibbs
Plaintiff, *pro se*

Distribution:

CNHI/The Herald Bulletin
℅ Craig Borowski
Littler
111 Monument Circle, Suite 702
Indianapolis, IN 46204