Timeline

July 2020

I have been on doctor's orders to work from home since March 2020. At the end of a phone call about something else, THB Editor-in-Chief Scott Underwood asked me whether I felt comfortable yet coming back into the office. I said, "Do we have a vaccine yet? As long as we don't, I won't feel comfortable." He had prefaced the question by saying he wasn't trying to pressure me or anything and that I was doing a good job working from home. After I answered, he said if I wanted to go out and cover something in person that wouldn't mean I always would have to do it. Not sure whether that even was legal to ask since I fall under ADA. But it was an uncomfortable exchange for me. In spite of what he said, I felt some pressure because there really was no reason to bring it up at all.

January/February

Scott enters several articles written by Rebecca R. Bibbs in 2020 in several contests, including CNHI and Hoosier State Press Association Foundation. Each entry carries an entry fee. Scott also agrees to reimburse Rebecca R. Bibbs for three entries in the Society of Professional Journalists contest. His willingness to pay for the entries demonstrates his belief in the quality of Rebecca R. Bibbs' work.

Feb. 12, 2021

After having written a report on letters sent by Lindsay Brown and Tamie Dixon-Tatum in the morning, I started receiving pretty frantic phone calls from News Editor Jim Meyer, who rarely calls me at all. I usually do most of the calling to update him on things. I was on the phone doing an interview for another story but tried unsuccessfully to call him back. Finally reached him 1 a.m. Complaints failed to be backed by data. Details are included in a letter to Bev and Scott.

Feb. 16, 2021

A Black reader and sometimes community source for my reporting, Anikka King, passed on an unsolicited compliment made about my work from a member of her church who is not known to me

Feb. 18, 2021

Sent THB Publisher Bev Joyce, Editor-in-Chief Scott Underwood and News Editor Jim Meyer a letter about the Feb. 11 phone call from Jim about the sourcing and let them know I considered it the creation of a hostile work environment. Letter was written and dated on Feb. 15 but had held on to it rather than sending it to make sure that was the thing I wanted to do. Sent it at the urging of a former coworker.

Exhibit 1

1

Later in the day found an email from Diane Airhart who said she was sending a thread regarding a letter of hers that she was forwarding to Scott, saying she felt my response to her white supremacy was unprofessional. She is the ex-wife of the other full-time reporter Ken de la Bastide, who is a white male and treated with a great deal of favoritism in the newsroom.

Caren Short praised me in a Facebook post for alerting the community to issues related to the Anderson Community Schools' search for a permanent superintendent, demonstrating the need and confidence of readers in her reporting.

Started feeling a bit of ongoing nausea I believe is caused by the stress of this situation.

Feb. 19, 2021

Received a call from Bev and Scott about 11:19 a.m. to discuss the letter. They spent the first 15 minutes telling me how they wished I had spoken to them before writing the letter. They said if I was worried about COVID-19 that we either could have spoken by phone or in the big conference room where we could socially distance. I repeatedly told them it wasn't about a fear of COVID exposure. I told them in so many words that I wrote the letter as documentation in the event there might be some sort of problem. Bev and Scott said repeatedly in the discussion they didn't know I felt the way I did and they valued my work. Bev and Scott tried to reassure me that while advertising is important, it doesn't affect management's commitment to journalistic integrity. Scott assured me he talked to other reporters about their sourcing, too and admitted that He hardly ever has to correct course with me in that regard. Scott admitted he directed Jim to speak with me about the sourcing issues and gave him an outline of what to say. Scott admitted he had wrongfully attributed comments to Lindsay Brown in the Biden article, said he was embarrassed about it and apologized. During our discussion, Jim had brought up a routine change to a story lead some thought sounded like opinion. I disagreed but didn't argue because there was nothing particularly special about that edit. Scott brought this up, and I said the same to him. He also said he appreciated that I don't usually get bent out of shape over edits because some writers do. Scott also pointed out that he supported and was excited my suggestion I write a monthly Indiana In-Depth equity and inclusion package, which often includes information about the Black community. And this is true. But just because people aren't biased all the time doesn't mean they aren't biased some of the time.

Received a copy of an email to Diane Airhart from Scott saying he would get back with her after reviewing it with me on Monday.

Feb. 20, 2021

Julie Short, a member of Be the Bridge (Madison County) praised my reporting in a Facebook post lauding the work of several in the Anderson community who bring awareness to the issues surrounding the ACS superintendent's search.

Feb. 21, 2021

Wrote email to Scott letting him know that I was not interested in "reviewing" the email and that I felt no need to justify to white employers why I thought something was white supremacist or that I confronted someone about it. I also let them know that I would consider any attempt to discuss it the creation of a hostile work environment.

Feb. 23, 2021

Received email from Scott saying he would like to set a time for him and Bev to speak with me on Monday. I replied that if any of the content of the conversation is about what has transpired over the past week, I would be comfortable only if Tamie Dixon-Tatum were in the discussion with me and that I would forward the relevant paperwork to her so she would have a framework for the discussion.

Scott Underwood made no mention of my Black History Month package on the experience of African-American workers at General Motors. I typically write the BHM package for the newspaper and win praise for it. Other editors, including Heather Bremer and Paula Bivens made a point of praising the package. Shift could be start of attempt to diminish the importance and try to establish substandard quality of my work in preparation for future termination.

At this point, every interaction with Bev and Scott, whether by phone or email, leads to nausea.

Feb. 24, 2021

Received email from Bev still trying to set up Monday meeting. She offered to bring CNHI HR Senior Vice President Terrence Alexander into it.

Feb. 25, 2021

Starting to lose sleep over this stuff. Still feel anxious every time I see an email or phone call from the paper. Had been looking forward to the vaccine and going back to the office after a year working at home, but all I feel now is dread. I feel kind of how Traci started to look as the joy was sucked out of her after Jim came. I guess I am having as much success with Scott and my issues as she had.

Sent email to Bev saying having Terrence is fine but that he represents the interests of the company, not its workers and that I still want to have Tamie in the meeting.

Bev tried to reach me at 10:03 a.m. I was not available at that moment because of a phone call with a source but called her back at 10:52 a.m. she tried to explain that this wasn't about my work or it's quality but just about company policy and engagement with the public and that they weren't trying to bully me. I told her that as long as this is about Diane Airhart and my response to her email, it's very much about that issue. I explained I have a zero-tolerance policy to white

3

supremacy and that I don't feel that my white managers are qualified to tell me what is racially offensive or how to handle it. I also explained once again that I was doing Diane a favor and could have raked her over the coals because she didn't understand what she was saying. Bev asked whether I was willing to speak with just Terrence alone. At first, I agreed, but I don't think that's a good idea. In my opinion, the company absolutely is assisting Diane in her attempts at white silence, which makes the newspaper a part of a systemic problem.

Feb. 26, 2021

Again having trouble sleeping. Racing thoughts about all this mess.

March 1, 2021

Still feeling anxious and not sleeping well. Starting to have trouble concentrating on my work. Didn't help that I got a nasty email from Bev today ordering me to attend an in-person meeting Wednesday under the threat of termination. Someone seems to forget that I fall under ADA and that she had said in our Feb. 19 meeting that if I am uncomfortable coming in we could do phone or other types of meetings. Also claimed, as expected, that this wasn't race-related.

March 2, 2021

I came into possession of emails showing the lengths to which Scott Underwood has been willing to go to protect a white male coworker. He NEVER ran a correction or clarification to a story in which the subject asked on multiple occasions over several months to determine the exact source of the public accusation we made as a newspaper, a source that by all appearances has been fabricated.

March 3, 2021

The meeting with Bev, Scott and CNHI Vice President Terrence Alexander has been postponed indefinitely because I accused them of racial and gender bias.

March 4, 2021

Fruitless phone meeting with Terrence Alexander who called at 2:33 p.m. He then explained he was calling because of my disturbing allegations of racial and gender discrimination and that he was calling to collect information about it.
I said if they wanted to be mad about anything, it should be that I didn't write the article and rake Diane Airhart over the coals. Terrence then said that no one seemed mad to him. He missed the point, just like Diane did.

In talking about my response to Diane, he said he read it and thought I shouldn't have said anything. I assume he referred to the second email. I explained that the first email in which I detailed my responsibilities and hers when it comes to communication when she accused me of

4

bias was not driven by emotion. Her complaint is one that happens almost every day, so that was just Thursday to me. In regard to the follow-up in which I explained why I was not going to write about her response to Tamie Dixon-Tatum's letter, I told him nothing I said was untrue nor did I use profanity, Terrence then asked why I said anything at all. I told him because that's typically what I do when people seek coverage. And in Diane's case, she wasn't going to let it go because she pointed out in her complaint to Scott that I still hadn't written about it, demonstrating that what I said clearly went over her head and that she had no clue how people would come for her if I did write about her response. I just felt in this instance, it was best to wait for the official response from the board president. I don't think Tamie ever got one to her letter, but Lindsay did.

At one point, we got into a discussion about Terrence's role. He talked about how he was there to bring the parties together not to decide who was right or wrong. I laughed and told him to spare me. I have been a union president, and I know whose side HR is on, that he represents the company. He then said he represents the company AND the workers. He gave me a detailed description of the ways he felt he helped in contentious situations like this. He seemed offended when I dismissed all that. And the. I asked him who paid him. That's whose side he is on.

He pushed for proof of my accusations. The way he said "proof" came with a note of skepticism, but these people seem to forget I have won awards for investigative journalism. I know how to assemble evidence, and I have worked with a lot less in investigating other organizations. He said he wanted it right away, but I explained it would take a little time to assemble everything. I also explained that I had 10 stories to write for the Annual Report, which adds up to about 55 hours of work IN ADDITION to my regular work.I also am supposed to be on vacation week after next and obviously wouldn't take the time that is supposed to be away from work to assemble this. Left it without a specific date but told him it would be sometime after my vacation.

March 8, 2021

Got a call from Scott and Jim at 9:35 a.m. telling me that I would be taken off the ACS beat until "this situation" is resolved, though it's unclear whether he means the meeting or my allegation of discrimination. However, Diane Airhart, the board member at the center of this is Ken's ex-wife. Looking at the master list, Don Knight was assigned to cover the meeting. No one has the level of experience I have in diversity reporting or education, so it seems difficult that that they can make a case of this being in the best interest of readers. I feel the move is retaliatory.

Scott texted and asked about progress on the Bill Watson/NAACP story. I told him I had done the interview with Bill and that I didn't see it so much as a school story since there aren't any real current programs. I told him I thought it was bes to approach it the way Jim suggested with Old School, New School. Scott texted back he thought that was a good idea.

March 10, 2021

Was told that Don Knight had called Tamie and Lindsay, who wanted to know about the change. I told them only that I was taken off that beat and that beat changes sometimes happen.. Interesting since I was told that I referenced Lindsay too often. Only one day after he took over the beat? So it's evidently OK when a white male does it but not me.

In looking at the reporting done by Don last night, there are a number of glaring deficiencies. This was a meeting in which three significant issues were discussed and none were covered adequately

1. Superintendent search: Don reported that board President Pat Hill provided an update on the number of applicants during the meeting. What he apparently didn't do was double back after the meeting and capture some demographic information, which is particularly important in this search because of community criticism of the process and representation issues. He should have tried to get some sense of demographics, including race and gender as well as how many, if any, have urban school experience.

2. A report was made on mental health issues in the district. This was the lead to Don's story. Indeed, that report was important, but it should have been a standalone story with deeper reporting. One of the issues with mental health generally in ACS is that most districts use a service provider with masters-level workers. Meridian, to my knowledge, has only bachelors-level workers supporting the children with the greatest need.

3. A report also was made on the depth of the COVID slide in ACS. While we have reported on this issue before, the public was being provided with important statistics that help frame the discussion. Again, this merited a deeper look rather than immediate reporting. In reporting

4. statistics, Don reported percentages, but straight numbers actually should have been reported, too. Officials reported that the district's 7,000 students received 15,000 failing grades. That's not every student. But if seven classes were assigned to each student and if certain students failed all classes, that would be more than 2,000 or about one-third of students failing. What isn't made clear with this story is the sheer number of ACS students who actually are failing. Don's reporting also missed is that the person doing the reporting gave individual assessments of each school. When he got to COMPASS, the alternative school, he said something along the order of that being expected. This apparently did not catch Don's ear, probably because of inexperience but probably as much because of implicit bias. I would have followed up.

March 15, 2021

Was included on an email this morning that was a letter to the editor from Lindsay in which he discussed his perceptions that my removal from the ACS beat was for reasons of bias.

Also received a copy of an open letter from Tamie Dixon-Tatum in which she also expressed the perception that I was taken off the beat because of white silencing.

March 16, 2021

Received an email fromTerrance Alexander that appeared to be somewhat threatening. He insisted I have my evidence to him by 5 p.m. Friday March 19. I responded that would not be possible and that I would have it to him by April 2, at the earliest and that any continued communication about the matter prior to that would be considered harassment. It takes time to assemble my evidence.

March 18, 2021

Scott and Jim called to let me know that Tamie and Kim Townsend were unhappy about the story published Wednesday based on Bill Watson's suggestion. Scott said he told them that a correction or clarification was in order only if I reportedly something incorrectly and that they were welcome to clarify through a letter to the editor or guest column. I

April 1, 2021

Scott informed those of us in the morning meeting that Don Knight after more than two decades with the paper has resigned. Assume his resignation is personal and not related to this situation. His last day is April 9.

April 3, 2021

• Sent Terrence Alexander an email update on the progress toward sending him the information for his investigation.

April 6, 2021

Jim this morning assigned me a story about Lindsay Brown's rise to president of the state African American Democratic caucus and Tamie taking over the regional caucus. Brown's new position at the state level demonstrates that his influence really can't be overstated and that he is an appropriate source. In fact, several people have referred to him as Anderson's MLK. And would we not have covered him?

April 8, 2021

Received an email from Terrence Alexander, saying he was concluding his investigation and found no wrongdoing and would allow Bev and Scott to schedule their meeting with me. Emailed Terrence the complaint. Had planned to mail on April 7, but I had to go all the way to Anderson to make copies since the packet was so large. By the time I returned, the post office was closed, so I sent it this morning. I feel he has tried to rush me all along even though I explained there were a lot of elements and evidence to gather and put into an order he could follow. For instance, I had to do an audit of Black sources, something that had to be created especially for this situation.

April 13, 2021

With Don's last day being last Friday, it came down to Ken or me to cover the April ACS board meeting. Ken was selected, even though he has a clear conflict because of Diane Airhart. If there was a lesser of the evils, I believe it should have been me because I have no conflict. After the meeting, a couple of people in attendance commented how Diane tried to wave at Ken under the radar from the dais.

Right before the start of the meeting, I was approached by an ACS administrator who asked whether I was covering the district again. When I said I was not, the administrator leaned in and said, "That is what structural racism looks like."

April 22, 2021

Was informed by a coworker that CNHI VP of Human Resources Terrence Alexander has been in Anderson since maybe Monday in closed-door meetings with Bev and Scott as well as people who appear to be other CNHI executives/lawyers.

Traci was wild to introduce herself to ACS Superintendent Joe Cronk and email the principals by way of introduction. However, she was told specifically not to contact Lindsay Brown and Tamie Dixon-Tatum until he had made contact first. This all is odd in that they are not school officials and normally would be contacted and served introductions on an as-needed basis.

April 28, 2021

Lindsay told me Scott had called last week to let him know Traci would be calling to introduce herself. Very odd.

April 29, 2021

I am the only reporter on duty, and I have written all the centerpieces so far the week. Ken is on vacation and Traci and Andy are out sick. I wrote Saturday's CP on John Pistole's book, Monday on the Urban Fresh bus, Wednesday on Tom Barmes and today's IID sidebar. Can't say I am not pulling my weight.

May 13, 2021

Received an email today from the CNHI Vice President of HR, saying he had completed his investigation and found n o wrongdoing. (Exhibit A) I thanked him for letting me know and reiterated that because of this outcome, I planned to file a complaint with the EEOC by June 30. No mention was made about the requests that were made in the complaint made to the company. Clearly, there is no intent to give me anything I requested.

May 13, 2021

I received a copy of an email sent by Black community member Anikka King, expressing concern about the newspaper's direction in terms of its coverage of the Black community. (Exhibit B)

May 18, 2021

I received an email from Herald Bulletin Publisher Bev Joyce telling me the management meeting with me that had been postponed because of the discrimination investigation was back on and will take place on May 20. (Exhibit C) Some of the email, particularly the part letting me know what was on the agenda, was clearly cut and pasted from the March 1 email in which I was ordered to attend at the risk of termination of I didn't. What is noteworthy is that even though I was told there was no evidence of wrongdoing, two issues had been left off the agenda: sourcing and my tone. This tells me they know they were wrong about these two issues. I sent back an email reiterating that I considered their insistence on this meeting harassment and the creation of a hostile work environment and would be filing a formal complaint with the EEOC. This evening, I did file the complaint.

May 29, 2021

As I went into the meeting today with Bev, Scott and Terrence, it seemed unwise to do so without taping it and preparing some remarks. I let them know upfront that I was recording the meeting. Clearly, they weren't prepared for that, and Bev stopped everything so Scott could start their recorder. I then proceeded to clarify that this was the meeting they had insisted on threat of termination that I participate in violation of my civil rights. Crickets. As I proceded in reading my statement, Terrence tried several time to interrupt me and told me this was not the time and place. I said since there were some issues missing that weren't on the first agenda, in the interest of thoroughness, I wanted to cover those. I started with sourcing. Terrence interrupted and said there was no need to talk about that because it had been resolved — only no one ever told ME that. In the end, the meeting was 20 minutes. After my statement, it was relatively calm. There was no reprimand, but I'm sure there would have been had I not gone in there prepared to record and and insisting on the clarifications.

June 16, 2021

In our morning planning meeting run by Scott, Ken today brought up wanting to work on an article about one-hour parking being enforced by the county in front of the courthouse. During that discussion, he openly spike about recommendations he made in a public meeting to county commissioners, an admission of his undue influence during meetings. Scott did not react to that. Traci also was in on that meeting. This is again evidence of Ken inserting himself to become the news. Ken's participation in public meetings and his influence on their trajectory also can be confirmed by other witnesses to this action, including Lindsay Brown, Tamie Dixon-Tatum and Anikka King, each of whom are regular participants in various public endeavors.

July 25, 2021

9

Today I was assigned to cover the annual Ollie H. Dixon Parade and Picnic. There are two problems with this assignment:

1. This is an event specifically for ACS students, so this is part of the beat that has been given permanently to Traci Miller, so she is the one who should have covered it. Also, if I am otherwise unsuitable to cover ACS, why am I suitable for this. Their treatment of me on this beat is capricious and arbitrary.
2. There was an assumption I was free to cover it. This is problematic in that Traci Miller was promised she would not have to work weekends when she returned. However, when I covered ACS events, I was not given options not to cover weekend events and spent 18 hours covering Band Day. I was told this was part of the beat. So a white woman's interests are accommodated but not those of a Black woman.

July 26, 2021

Traci told me today that she has tried to speak with management about the coverage for Band Day at the Indiana State Fair. Anderson High School is the defending champion, so it seems crucial to cover this. In the past, much wa ci s made of this. I literally was there from 7 a.m. to midnight tweeting and writing several online stories about each participating Madison County band. It was a grueling day physically and mentally. This was mandatory weekend work in which I produced a double truck.

July 27, 2021

Tomorrow, the first schools, including ACS are returning for the 2021-22 school year. This should be known to the editors and ACS reporter because I did a big back-to-school package that appeared on Saturday. But when I inquired about a back-to-school centerpiece for Thursday, neither the editors nor the reporter had a plan. This is something that requires some coordination because of the photo. We always give ACS a centerpiece whether or not they are first back because they are the district representing our core readership area. It's important this year because of COVID. Last year, ACS was the only district that remained virtual for a while. The reporter is a fine award-winning reporter, but she is overextended on her other beats. Clearly, I am the best reporter for the job, but because of retaliation, that part of the education beat has not been restored to me.

Sept. 1, 2021

We learned today that the sister of a retired coworker, Paula Bivens, passed away over the weekend. Ken suggested we collect money for flowers or a donation. Scott then said the company would take care of that. Interesting since my brother died a month earlier on Aug. 2. No one sent flowers from the company or among my coworkers.

Sept 13, 2021

As of this date, ACS has not been restored to the education beat, clearly an act of retaliation.

Sept. 27, 2001

Scott shared with us this morning that a digital editor has been hired to replace Heather. He is a qualified candidate with prior similar experience at WRTV. However, his hire makes the entire newsroom management white and male.

March 2, 2022

Had EEOC mediation today. I took the day off because of the 6-hour timeframe, but it was over in 50 minutes.
Wish this was over. Now that this has to go to a new level of investigation, I am feeling stressed and and down again.

April 21, 2022

Today is Kylee's last day. Since she is the one covering ACS and they claim the beat now belongs to someone else, they have an opportunity to restore it to me. We'll see what happens.

May 10, 2022

I was assigned to cover the Anderson High School Top 20 dinner. Andy, another white male with no particular knowledge of education, was assigned to cover the board meeting.

May 25, 2022

Covered Mr. Z's calculus class presentation on STEM at Anderson High. Received an email from him about it.

June 1, 2022

Received a last-minute flyer from Lindsay Brown on a community conversation he wanted to have Thursday about the school improvement grant his committee wants ACS to apply for from the state. Wrote an advance.

June 2, 2022

Covered Lindsay Brown's community conversation. ACS Superintendent Joe Cronk was not there and did not respond to my request for comment.

June 9, 2022

Received a call from an EEOC officer asking whether I planned a response to CNHI's response to my claim. Frankly, I haven't had it in me to read it. I just don't want to deal with them and their lame excuses. I have had enough trauma. I feel the initial complaint, diary and evidence I presented speaks for itself. If not, oh well.

June 10, 2022

Was informed the article looking at the claims from both sides on the school improvement grant won't run Saturday because Scott Underwood ran into issues with time to read it.

June 5, 2022

Received a right to sue letter from the EEOC and am given 90 days to file in either state or federal court, which I plan to do.

June 14, 2022

Attended the ACS meeting because of Lindsay's call to residents to show up and speak to the district's failure to apply for a Next Generation School Improvement Grant. It also was the same night as a vote on the Indian mascot.
Andy clearly was overwhelmed by the pace of events. As he chased down one speaker, I captured and emailed to him the comments of another.
There actually were several other things said that should develop into future stories, including a presentation on the upcoming strategic planning process and a woman who claimed her son was denied breakfast on more than one occasion because of horseplay. I got her phone number and told Andy I would do the story. He was clearly relieved.

June 15, 2022

This morning during the Zoom meeting, I told the group I planned to work on the story about the woman's claim about her son not receiving breakfast. Scott told me tersely this was Andy's beat and his story to do. This is another example of white male privilege. As often as Traci and I have complained about Ken de la Bastide trampling our beats, nothing ever was done, but I am told in no uncertain terms this is someone else's beat.

June 23, 2022

Today, The Herald Bulletin published the big investigation into the claims ACS officials made as their reasons for not applying for a major school improvement grant from the state.
During today's morning Zoom meeting, Scott said he would get with Jim and call me after the meeting to do a "postmortem" on the timelines, trajectory and coverage of the story. Scott started by asking whether the initial story should have been a bylined story rather than a brief about the meeting, which really surprised me. I responded that the public needed to know what the meeting was about and understand how it came about. Seemed an odd question give the

largeness and gravity of the issue involved. He said if a story involved ACS, Andy should write it, though it's OK if I am writing a trend story and seek comment from ACS about something like that. Andy already has several large beats, including business and environment, plus he is a part-time editor. They are going out of their way and don't care whether they have the best person for the job.

During that meeting, Scott made clear in no uncertain terms that this was Andy's story to cover and that he should have done it.

Scott also noted the complaints from ACS officials about my coverage of the issue and that they clearly wanted me off as the reporter. He said, as he has many times before, that sources do not dictate who the reporter is, yet in this instance, that is exactly what is happening. He did not allow that to happen when I covered the Elwood police, and to this day, I am the reporter on that beat even though Chief Jason Brizendine refuses to speak with me. But there are no issues of race there, whereas the issues with ACS are racially charged.

Also, nearly 10 days after the ACS meeting, there is no story and no apparent plan to report on the strategic planning process. Andy also never asked for the phone number of the woman with the breakfast complaint, so, clearly, that story never will be done.

Sept, 15, 2022

Today, I mailed in my claim against CNHI to the federal court in Indianapolis. To be honest, my heart wasn't in it. This whole journey has been enhausting, and my life has become even more so with added personal responsibilities at home. But my friends and family insisted I ave a duty to take CNHI to court and give the company and its agents a better understanding of their responsibilities to their employees and the community. It was hard to disagree with that, but I can't wait to have this monkey off my back.

Oct. 28, 2022

Tocay was my last day working for The Herald Bulletin. Between the emotional challenges 0f working in that environment and an increase in personal responsibilities, it was no [onger sustainable for me to be there,

From: **Rebecca Bibbs** rebecca.bibbs@heraldbulletin.com
Subject: **Fwd: Investigation**
Date: **May 13, 2021 at 12:10:56 PM**
To: **rbibbs@rocketmail.com**

**Rebecca R. Bibbs**
Reporter

765-640-4863

From: "TAlexander@cnhilic.com (Terrence Alexander)" <TAlexander@cnhilic.com>
To: "'Rebecca Bibbs'" <rebecca.bibbs@heraldbulletin.com>
Date: Thu, 13 May 2021 08:30:37 -0500
Subject: Investigation

Dear Rebecca:

I have concluded my investigation of your recent complaint alleging race and sex discrimination. It included not only my interview of you but also of the individuals you contend engaged in the conduct. As part of my investigation we spoke by telephone on March 4, 2021. During our call you stated that you had a file of documentation to support your allegations. I requested that you provide the documentation so that it could be reviewed as part of my investigation. After our March 4th conversation, I reached out to you multiple times in effort for you to provide me with said documentation. On April 8, 2021 I received your detailed written complaint and received a copy of the exhibits referenced in the complaint on April 14, 2021. After careful review of all the information and documents you provided, I went to the Herald Bulletin on April 21st and 22nd for an in person investigation.

Based on my investigation from all of the information provided by you as well as the management team from the Herald Bulletin, I have been unable to identify any information substantiating that discrimination or other inappropriate conduct occurred. CNHI is committed to maintaining a workplace free of unlawful discrimination or harassment and to promptly investigate any complaints of any discrimination and/or harassment and take appropriate action. We will continue to monitor the situation.

If you experience any other behavior you believe to be inconsistent with our policy or have any other concerns, please contact me immediately.

Sincerely,

Terrence

Terrence L. Alexander
**SVP, Human Resources**
CNHI, LLC
201 Monroe Street, Suite 450
Montgomery, AL 36104
334 293-5846 phone
205 757-6740 cell
334 293-5911 fax
talexander@cnhi.com

Exhibit 2

From: **Rebecca Bibbs** rebecca.bibbs@heraldbulletin.com
Subject: **Fwd: Sourcing Issues**
Date: **Mar 1, 2021 at 5:13:15 PM**
To: **rbibbs@rocketmail.com**

**Rebecca R. Bibbs**
Reporter

765-640-4883

From: "Rebecca Bibbs" <rebecca.bibbs@heraldbulletin.com>
To: "Beverly Joyce" <beverly.joyce@indianamediagroup.com>, "Scott Underwood"
<Scott.Underwood@heraldbulletin.com>, "Jim Meyer" <jim.meyer@heraldbulletin.com>
Date: Thu, 18 Feb 2021 20:19:19 -0500
Subject: Sourcing Issues

Feb. 15, 2021

Bev, Scott and Jim,

It is sad that the management of The Herald Bulletin has chosen not once but twice to engage in an act of bias against a reporter of color and against the community which it claims to serve during Black History Month. This is intended to document an incident of bias and discrimination against a THB employee.

As I went about the business of covering important news coming out of Anderson Community Schools last week, my direct supervisor, Jim Meyer, urgently was trying to call me in the early afternoon of Thursday, Feb. 11. I had just turned in an article about a couple of letters sent to the school district by members of the Black community following a meeting in which a formal request for participation of members of the Black community was made by a board member but died because of a failure in her ability to get one of her colleagues to even second the motion.

One of the most vocal critics of the school board is a member of the community, Lindsay Brown. Mr. Brown has had his own battles with this newspaper, repeatedly asking to be referred to as a "concerned citizen" rather than as an "activist," explaining to sometimes deaf ears that the latter has racial connotations that diminish his messaging in the eyes of the public. Editor Scott Underwood has circulated directives regarding this, but these have at time been ignored by other reporters and editors. I was notified by Mr. Underwood prior to the Nov. 3, 2020 general election in which Mr. Brown ran as a candidate for a seat on the county commission, that THB publisher Beverly Joyce was concerned about the frequency of his appearance in the newspaper and that it had been suggested that we were calling us and engaging in acts that specifically were intended to boost his profile among voters. Mr. Underwood said at that time he had told Bev that a review of the articles showed that Mr. Brown and the activities in which he was engaged and for which he was covered were legitimate activities we would cover regardless of his status as a candidate.

On Feb. 11 after Mr. Meyer finally reached me, he started the conversation by praising my work on the coverage of issues regarding ACS and the Black community -- followed by a "but," which was continued coverage of Mr. Brown, who is a regular fixture not only at school board meetings but also at the meetings of other governmental bodies where his words and actions also sometimes become the subject of news reporting. On this occasion, Mr. Brown had put together a letter signed by dozens of city leaders demanding a meeting with ACS board President Patrick Hill and two other board members. By any standard, this would be news regardless of who did the asking. I followed the same protocols I follow with the reporting of any other story on any subject of interest to the public coming out of a taxpayer-funded entity. Nothing was different than any other reporting I have ever

Exhibit 5

done except that the subject of the reporting is Black and making waves, which I believe some white members of the public are trying to have shut down by complaining to THB management.

In addition, Mr. Meyer asked whether there was any other news coming out of ACS other than the superintendent search. I told him there was and that I cover it, including increasing scrutiny of the at-large voting system that led to the school board becoming all-white after the November election in spite of a 46% non-white student body. I also have been covering the coronavirus pandemic and its effect on school operations as well as a variety of other issues. Many I do not cover as daily news because they are subjects that are new to me and require additional research and interviews, often ending up as centerpiece stories. He then suggested that I start covering some lesser important actions coming out of the meetings. He also mentioned that I had used Mr. Brown as a source in a recent article about Black reaction to Biden's first days in office, presumably as some kind of misguided proof of how often I refer to Mr. Brown. Indeed, I did quote a Mr. Brown for that story – Terrell Brown, not Lindsay Brown. But we all know that one Black person is just like another. All of this clearly was intended to redirect me from covering the actual news, and I let Mr. Meyer know that it was not acceptable and that this was not the first time management had tried to slow down my reporting on issues of importance to the Black community.

In 2016, I decided to write a package of stories on sundown towns for Black History Month. As I always do with large packages, I planned a main bar and two sidebars totaling about 60 inches as a Sunday read to start on the front page and continue on a full page inside. On the Friday before it originally was supposed to run, Mr. Underwood called me into his office and said he was going to hold it because it felt too "speculative." As we talked, Mr. Underwood asked me a series of questions all of which were answered in the article as written, leading me to realize he had not really read it. When I asked how much of the article he had read, he said responded four paragraphs. So, to be clear, he based a decision on the preparedness of the article based on four paragraphs. As I usually do with larger articles, I started it with the personal experience of someone who fit the situation, in this instance, a young man who had lived in Alexandria. Mr. Underwood said he wanted me to interview more Black people who lived in Alexandria and Elwood. I told him that was offensive because if I were to write an article about, say, rape, the experiences of one woman would be sufficient to make the point, and I would not need two more to ensure it was valid. But the real reason, I believe, is that Mr. Underwood feared pushback from the community and hoped I would be able to find Black sources who would give more glowing assessments of their residencies in these towns. But even the source Mr. Underwood was able to dig up for me shared adverse experiences.

These are not issues of reporting. These are issues of backbone. In both instances, management was concerned about either real or perceived blowback from the community. I suspect management has received complaints about the fact that I cover Mr. Brown's words and deeds. In addition, applying white ideas of reporting does not always work on the Black community. If it did, the other reporters at this paper would be stronger at it. But the history of interaction with white people and mainstream media makes Black people very suspicious. Many Black people are old-fashioned and require that a reporter be vetted, so there often is little on-the-spot reporting. That's why when I sent out two dozen requests on Facebook for someone to speak with about the Biden story, I got one timely response – and it was from a Hispanic woman. And many Black people, because of personal fears about their own situations, prefer to have their views put forth by designated leaders. At this time, those in Anderson would appear to be Lindsay Brown, Kim Townsend, Tamie Dixon-Tatum, Anikka King and sometimes Larry McClendon and Terrell Brown, all of whom act individually and sometimes in concert with one another. These people happen to be fairly confrontational, so they make headlines.

I am an award-winning journalist with 34 years' experience as a reporter and editor at the state's largest newspaper and as managing editor at the state's largest consumer magazine. I think I understand sourcing and

usually am praised for the different people I am able to find and interview. In fact, Mr. Underwood had asked me specifically about one of the sources used in the Biden article and praised me for it. It just seems a little odd that when I am confronted about my sourcing it always seems to be about stories of interest to the Black community.

Let me be clear: I resent the implication that I have some sort of bias. I am not from Anderson, have never lived there, paid taxes or benefitted from the amenities they afford, aside from driving the streets, which is primarily in pursuit of the work I do for this newspaper. I have not covered anything having to do with Mr. Brown -- who I actually have never met in person -- any differently than any other topic I have covered. It's not my fault that he is active and that he actually shows up at the meetings to confront the ACS board and members of other governmental bodies. I am a mixed-race woman of African descent, but that doesn't make me any more biased as a reporter toward the issues of the Black community than being white automatically means you are biased against them or for white people.

I am fine with being edited and with being given extra ideas to make my articles better. What I am not fine with is interference from management in the development of articles because of pressure put on the paper by members of the community. I firmly believe that advertising and editorial are separate entities that need to operate independently to ensure the strongest, most authentic reporting for our readership.

I have a personal three strikes and you're out policy. This letter serves as documentation of the two prior incidents. If I am ever confronted about sourcing in the Black community again, I will consider it harassment and the creation of a hostile work environment and use this document as the basis for an EEOC complaint. But I think we are all reasonable people, and I hope that won't be necessary.


Sincerely,


Rebecca R. Bibbs

**Rebecca R. Bibbs**
Reporter

765-640-4883



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Indianapolis District Office**
101 West Ohio St, Suite 1900
Indianapolis, IN 46204
(317) 999-1178
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 06/15/2022

To: Ms. Rebecca R. Bibbs
440 North 12th Street
NEW CASTLE, IN 47362
Charge No: 470-2021-02349

EEOC Representative and email:    Frederick BruBaker
Enforcement Supervisor
frederick.brubaker@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 470-2021-02349.

On behalf of the Commission,

Digitally Signed By: Michelle Eisele
06/15/2022

Michelle Eisele
District Director

Exhibit 3

**RESUME**

Rebecca R. Bibbs
440 N 12th St.
New Castle, IN 47362
(765) 393-7426
rbibbs@rocketmail.com

## EXPERIENCE

### Reporter, Anderson (Ind.) Herald Bulletin, April 2015 to Oct. 28, 2023

• Primary beats: Education; northern Madison County towns; race, equity and inclusion; and general assignment

• Previous beats: public safety, including law enforcement and courts; general assignment

### Associate Editor, The Avenue Newspaper

Wrote general interest articles.

### Associate editor, Indiana Minority Business Magazine

I redesigned the magazine, starting with the first quarter 2014 edition, for form and function. I created new departments, including "Board Room Briefs," "Startup," Tech Talk," "Skill Set" and "Hoosier Marketplace." In terms of the writing, I introduced writers and readers to the narrative lead and feature leads, in general. Under my direction, we also moved the magazine away from its narrative-heavy style to a more user-friendly format with colorful, eye-popping visuals. We made the magazine more reader friendly by changing typefaces, adding standing heads and acquiring more related images. In addition, we reinforced the magazine's mission, which previously had been over-focused on Indianapolis, by ensuring we covered the entire state. We also visually reinforced the magazine's mission by including more images of the people we featured and interviewed. Also introduced the use of QR codes to direct readers to the website for more information since links aren't possible on a static printed page.

### Freelance writer and editor

Writer, Chicago Tribune, Chicago

Writer, Sun-Times newspaper, Chicago

Writer, Pioneer Press' Oak Leaves newspaper Chicago

Writer, The Indianapolis Recorder and Indiana Minority Business Magazine

Writer, Web to Med SEO

Exhibit 4

Writer, CUHomepage

Writer, Infosystrade

Writer, Slingshot SEO (home and garden, travel, education, and health and fitness for various clients)

Writer, Chicago Parent magazine

Writer, Dance magazine

Writer, PACT

Writer, NUVO newsweekly

Writer, Editor and Publisher, April 1994; article quoted by J. Sean McCleneghan in "How African-American journalists view America's social institutions into the 21st century," The Social Science Journal

**Freelance communications**

• Public relations, SEO writer and social media consultant, Choice Eating (picked up by SNS Post)

• Public relations, SEO writer, Fight Fit

• Communications consultant, S-3 Communications

**Managing editor, Indianapolis Woman magazine; senior editor St. Louis Woman Magazine**

• Established and maintained online arts and entertainment reviewing system that helped nearly double hits and page views at www.indianapoliswoman.com in two months, allowing the magazine to start charging for online advertising. All this was done without a budget

• Established, wrote and edited blogs that appeared on the Indianapolis and St. Louis Web sites, including, "Renovations," "Weighing In," "Intern Diaries" and "The Unemployment Line" and "A Piece of the Pie"

• Established and maintained a system for providing fresh, original articles online.

• Created "Let's Get Fit" blog project to bring unique copy to the Web site, generate traffic and produce the possibility of additional revenue stream without allocating outside resources to minimize startup cost

• Responsible for selecting article topics, assigning them to writers and editing the copy for the main magazine, special sections and inserts, and online content; writing articles and secondary

copy, including headlines and artlines; some design of pages for special inserts; speech writing; establishing writer's guidelines; managing interns and freelancers; collaborating with advertising staff

## Assistant director of School and Community Relations, Indianapolis Public Schools

Media relations, external newsletter editor/writer, Spanish-language newsletter coordinator, community relations, crisis communications, communications counseling, event planning, contest entry writing/coordination (record includes seven Center for Leadership Development awards in eight years, one $25,000 from the Milken Family Foundation, one $10,000 Project E Award), grants consulting and writing (received both grants for which applied, totaling about $10,000), speech writing, workshop development

## Reporter/editor, The Indianapolis (Ind.) News and Star - Reporting: Herman Hoglebogle
(consumer); police; Marion County; dance critic; entertainment; general assignment; obituaries

Editing: Assistant to Inside Marion County editor, responsible for daily page articles and photos, working with regular and freelance staff; late Sunday night editor, responsible for front section and breaking news coverage

## Copy/design editor, The Elmira (N.Y.) Star-Gazette

Page design, copy editing, headline and artline writing

EDUCATION

• Completed four-week online course on video production, Poynter Institute

• Completed online social media certificate, Poynter Institute-CNHI

• Online journalism certificate, Poynter Institute-CNHI

• Accreditation in Public Relations, Public Relations Society of America

• Course work toward master's degree, Ball State University, double major in journalism and public relations

• Mid-level certification, Dutch as a Second Language (reading, writing, listening, speaking)

• Dual B.A.s in journalism and German, Indiana University-Indianapolis

AWARDS

• 2022, third place, Non-deadline news, and third place, Arts and Entertainment reporting, "It's Just a Matter of Time: Belford 'Sinky' Hendricks, Society of Professional Journalists.

• 2021, The Jacob P. Dunn Jr. Award given annually to the author of the best article in *Traces of Indiana and Midwestern History*, published by the Indiana Historical Society Press, for "It's Just a Matter of Time: Belford 'Sinky' Hendricks, Indiana Historical Society.

• 2020, first place, Non-deadline News, "Back Into the Buildings" series; second place, Non-deadline News, Society of Professional Journalists

• 2019, first place, Children's Issues, "Juvenile Justice: Initiative Encourages Courts to Find Detention Alternatives;" second place, Government Reporting, Pendleton Town Council, Society of Professional Journalists

• 2018, first place, Investigative Reporting, "Elwood Police;" second place, Best Education Reporting; and third place, Best Coverage of Government Politics, The (Anderson, Ind.) Herald Bulletin, Society of Professional Journalists

• 2018, Best Investigative Reporting, "Elwood Police;" third place, Best Public Service, "School Referendums," The (Anderson, Ind.) Herald Bulletin, Indiana Associated Press Media Editors

• 2018, Best In-Depth Feature or Feature Package, "Something's in the Water," The (Anderson, Ind.) Herald Bulletin, Hoosier State Press Association

• 2017, first place: Minority Issues, "Sundown Towns"; Education, "Seat Time;" Criminal Justice, "State of Crisis." Second place, Investigative Reporting, "Policing Themselves," The (Anderson, Ind.) Herald Bulletin, Society of Professional Journalists

• 2017, first place, Investigative Reporting, "State of Crisis;" second place, Enterprise Reporting, "Sundown Towns;" third place, Feature Writing, "Defeating Dyslexia," The (Anderson, Ind.) Herald Bulletin, Indiana Associated Press Media Editors

• 2016, second place, Investigative Reporting, The (Anderson, Ind.) Herald Bulletin, APME

• 2012, honorable mention. Minority Issues, "Minorities Fight for Power in Agriculture," Indiana Minority Business Magazine, Society of Professional Journalists

• 2010, third place, Criminal Justice, "Freedom of Speech," Indianapolis Woman, Society of Professional Journalists

• 2009, third place, Arts and Entertainment, "Country Girl," St. Louis Woman Magazine; honorable mention, "In the Fast Lane," Indianapolis Woman, Society of Professional Journalists

• Golden Achievement Award, The Achiever external newsletter, National School Public Relations Association

• Award of Excellence, The Achiever external newsletter, Indiana School Public Relations Association

• Achievement Award for a Blue Ribbon Campaign, "Multiracial Information," Indiana School Public Relations Association

• Arthur F. Burns Fellowship, International Center for Journalists

• First place, Column Writing, The Indianapolis News, Society of Professional Journalists

**Rebecca R. Bibbs Black Sourcing Analysis**

| Date | Subject | Lindsey Bowm | Thalia Dixon-Tatum | Kim Townsend | Rebeca Crumes | Other |
|---|---|---|---|---|---|---|
| Dec. 2, 2020 | ACS survey | X | X | | | |
| Dec. 6, 2020 | Diversity letter | | X | | | |
| Dec. 13, 2020 | Juvenile Probation | | | | | |
| Dec. 21, 2020 | Black journalists | | | X | | 3 |
| Dec. 21, 2020 | Student leaders | | | | | 2 |
| Dec. 23, 2020 | Xmas at Meijer | | | | | 3 |
| Dec. 29, 2020 | YER-Social justice | | | X | | 3 |
| Dec. 12, 2021 | Black riot reaction | | X | | | 6 |
| Jan. 8, 2021 | Black IN officials | | | | | |
| Jan. 11, 2021 | ACS supt. Search | X | | | | 3 |
| Jan. 19, 2021 | Andean Morehead | | | | | 3 |
| Jan. 19, 2021 | Free laundry day | | | | | |
| Jan. 20, 2021 | Kamala reaction | | | X | | 3 |
| Jan. 31, 2021 | Biden's first days | | | | | 1 |
| Feb. 1, 2021 | Lindsey's meeting | X | X | | | 1 |
| Feb. 9, 2021 | At-large elections | | X | | | 2 |
| Feb. 9, 2021 | BHM program | | X | | | |
| Feb. 11, 2021 | ACS program | X | | | | 1 |
| Feb. 9, 2021 | ACS letter | X | | | | |
| Feb. 17, 2021 | ACS letter update | X | | | X | 6 |
| 19-Feb-21 | General Motors | | | | X | 1 |
| Feb. 25, 2021 | REI workgroup | | | | | 1 |

Exhibit 6

# THE MORAL FAILINGS OF AMERICAN PRESS COVERAGE OF NAZI GERMANY

**By Elisabeth Zerofsky**

**March 14, 2019**



Exhibit 8

A few weeks ago, a six-thousand-word article in *Esquire* on the unexceptional life of a white teen-ager in peri-urban Wisconsin generated a furious online backlash. It appeared on the cover of the March issue, which was released in February—Black History Month—under the billing "An American Boy." Many commentators on Twitter decried the magazine's decision to kick off its series on growing up in America today through the lens of a straight white male. Others felt that the story failed to apply critical pressure to its youthful subject's internal ruminations on such topics as Internet feminism and the #MeToo movement. With the discomfort and confusion that it provoked, the *Esquire* story joined a series of public controversies surrounding the media's efforts to capture a new American political reality—far more extreme cases include "the Nazi sympathizer next door," published by the New York *Times* after Charlottesville, and an L.A. *Times* story on the sartorial normalcy of the white-nationalist movement—without always knowing exactly what they are seeing or how to handle it.

A survey published last summer by the American Press Institute revealed that forty-two per cent of the public thinks that "most of the news reporting they see is opinion and commentary posing as news reporting."

An additional seventeen per cent said that there was too much analysis. People wanted facts, they wanted them "verified," and, though they wanted some background and context, they mostly wanted to be allowed to come to their own conclusions. For many journalists reporting on the new right in the U.S. and Europe, it may be difficult to shake the feeling

that this is somehow irresponsible. There is a strong argument to be made that anyone who professes bigotry and hatred doesn't deserve to be considered seriously, let alone objectively. But that could preclude us from understanding the social circumstances that led to someone such as Richard Spencer, a figurehead of the alt-right, attaining a platform in the first place. If reporters do engage, what is to be done about the strong desire to condemn their subjects?

In his new book, "Berlin, 1933," Daniel Schneidermann, a French media critic and the founder of Arrêt sur Images, a French analogue to Media Matters for America, examines the work of American, British, and French correspondents posted in Berlin in the nineteen-thirties, to investigate how acutely the foreign press understood the threat of Nazism. This genre of comparison can be ahistorical and logically flawed. In 2016, as the laughter of Trump's Presidential campaign gave way to incredulity over its triumph, archival searches from the twenties and thirties came into vogue. A Vox headline in March, 2016, proclaimed, "The New York Times' first article about Hitler's rise is absolutely stunning," and American pundits, on both the left and right, were making highly imperfect analogies to the rise of fascism. But Schneidermann's book (published in French) isn't trying to make a one-to-one argument; rather, he takes up the question of reporters covering a new political reality in the face of their own uncertainty. The result is a kind of meta-history of the nineteen-thirties, recounting the rise of Hitler through the manner in which newspapers chose to convey each successive event, and how those choices affected popular understanding outside Germany at the time.

If it isn't already clear, we are not reliving the thirties, and Trump is not Hitler. One of the journalists whom Schneidermann admires is Edgar

Ansel Mowrer, a correspondent for the Chicago *Daily News* who had already been in Berlin for a decade when Hitler became Chancellor of Germany, in January, 1933. Mowrer's work strongly captures the widespread anti-Semitic violence of the years that preceded Hitler: Jews were assaulted in public, Jewish students were beaten up by classmates. And all German political parties had armed militias that confronted one another frequently—and violently—in the streets; hundreds of people were killed during the 1932 election campaign. This was the context in which Hitler was elected. After Mowrer published a book on this material, the same month as Hitler's inauguration, he was expelled from Germany.

But some characteristics are more pertinent. Schneidermann's analysis begins with the St. Louis, the ship that carried around a thousand mostly German and Austrian Jewish refugees across the Atlantic in May, 1939, only to see its passengers refused entry into both the U.S. and Cuba. (At the time, the newspapers reported that the U.S. had fulfilled an annual quota for German and Austrian immigrants, a claim that was later revealed to be likely false.) Viewed from the distance of eighty years, the tone of the coverage seems, to Schneidermann, woefully insufficient. He cites the Holocaust Memorial Museum's encyclopedia entry for the event, which notes, "though US newspapers generally portrayed the plight of the passengers with great sympathy, only a few journalists and editors suggested that the refugees be admitted into the United States." Schneidermann compares this to the media's more admirable response to

Trump's "Muslim ban," in 2017, which sent a mass of journalists to airports across the U.S. to tell the stories of people—stranded and separated from their families—whose rights had been violated.

When it comes to documenting the Nazis' murder of Jews,

Schneidermann describes the *Times'* coverage as fragmentary, incremental, and buried in "dry" briefings on interior pages. June 16, 1942, page 6: a short piece noting that sixty thousand Jews in Vilnius had been murdered. June 30, 1942, page 7: a press conference given by a Polish government official in exile concludes that around a sixth of the European Jewish population of six to seven million has been annihilated. Schneidermann tries to grapple with the possible explanations—the incredulity of the reporters and editors, the banalization of so much recurring death. (Although, on a much different scale, the dilemma is not entirely foreign to Schneidermann's audience: twenty-three hundred Europe-bound migrants drowned in the Mediterranean Sea last year, and the coverage of it in mainstream publications has been sporadic at best.)

There is, however, a publication that Schneidermann, eighty years later, believes achieved the right balance: the Jewish Telegraphic Agency. Founded, in 1917, by an Austrian Jewish journalist, the J.T.A., in Schneidermann's view, is to be admired for its professionalism and conscientiousness. Before 1942, many of the sources about Jewish persecution in Europe were themselves Jewish; according to Schneidermann, while the *Times* largely dismissed these sources as insufficiently "neutral," the J.T.A. was willing, with appropriate caution, to use their information in its reporting. At the time, however, the J.T.A. itself was considered biased—and, therefore, not a trustworthy source of information about the fate of Jews in Europe. Similarly, in French media,

Schneidermann feels that the only outlet whose coverage did justice to the magnitude of what it was witnessing was *L'Humanité*, the paper of the French Communist Party, which decried the Nazis' barbaric persecution of Hitler's political opponents and repeatedly called for international intervention.

"The problem is," Schneidermann told me, "there weren't any journalists with enough credibility to tell what was really happening in Germany without being suspected of being biased or taking sides." It was in part the *Times*' quest for credibility with its public—meaning, Schneidermann says, not seeming like "a 'Jewish newspaper' or a 'Communist newspaper' "— that prevented it from attaining the decibel level that we would now consider appropriate. "Activist journalism," Schneidermann writes, "journalism that subordinates the quest for truth to the quest for a truth that is useful to its cause, is the only journalism that, today, doesn't have to feel ashamed about what it produced. . . . Everything reasonable, scrupulous, balanced, in my opinion, contributed to lulling the crowd to sleep." But, he continues, "If I'd been a reader at the time, I probably would have quickly stopped reading after a few days, dissuaded by the bludgeoning."

There is a serious anachronism at work: the coverage that speaks to Schneidermann on an emotional level now was largely ineffective at the time it was printed. He muses that the journalists in the thirties needed to invent a new language, but he doesn't quite define what that language should have looked like—dry facts didn't allow an audience truly to comprehend the incomprehensible, but irony didn't work, either, and neither did outcry. He faults the news outlets, above all, for not publishing vivid portraits of the victims. "Facts. Raw facts," Schneidermann writes of press descriptions of Jewish refugees in 1939. "We can't accuse the *New York Times* of having avoided the raw facts. Except that the raw facts don't suffice. They never suffice. In order for a piece of news to touch consciences and hearts, there must be emotion running through it."

Schneidermann, when I spoke with him, added that, of course, "the situation today is totally different from the nineteen-thirties. In the thirties, there were the big papers and there were the small papers. Period. Today, newspapers are drowned in the social networks, drowned in Facebook and Twitter, which is to say drowned in an ocean of commentary. Commentators who are activists, moralists, et cetera." As a result, today's readers are inundated with emotion, and turn to legacy media for trustworthy information. Here, Schneidermann's analysis dovetails with what the American public says it wants. "I think what remains for journalism today is the essence of the profession," he said, "which is the verification of facts. Everywhere there is commentary. The only thing that's left, really, is investigating facts."

The public wants facts. But, as evidenced by the outrage at *Esquire's* story, something more than what we think of as objective facts is required to craft a representation of reality. *Esquire* may have wanted to make "Wisconsin a stand-in for the state of our country," as the Milwaukee *Journal Sentinel* wrote, to capture the subtle social forces of alienation and resentment that turned out to be strong enough to elect Trump President. But the story also seemed to deliberately withhold judgment; to its detractors, this didn't feel like objectivity. In an environment that, to many, is the source of perpetual moral crisis, the objective becomes subjective, and vice versa.

Schneidermann doesn't offer a neat solution to the contradictions that he unearths, but he does give a few other examples of work that has aged well. The American columnist Dorothy Thompson, Schneidermann says, saw Hitler immediately for what he was, describing him, in 1932, as a man "without form, without expression, his face a caricature . . . his movements

without dignity, anything but martial." Thompson offered a lucid assessment of Nazism as a "repudiation of the history of western man, of Reason, Humanism, and the Christian ethic." She was kicked out of Germany in 1934, but remained a tireless advocate against Nazi Germany. This strategy may not be available to every journalist, but Schneidermann also admires Georges Duhamel, a correspondent for *Le Figaro*, who faced certain pressures from his conservative bourgeois editors and readers in Paris not to moralize. On June 23, 1938, *Le Figaro* ran as a front-page headline a question that Duhamel, given the chance to interview Nazi leaders, would have asked: "WHAT DO YOU INTEND TO DO WITH THE JEWS?" In its simplicity, its directness, its willingness to seem naïve, Schneidermann finds it hauntingly unimpeachable.

According to Schneidermann, Trump designating American media as the "opposition" is the biggest threat to its credibility today, but not merely because the President's broadsides inflict damage on their own. The trap, Schneidermann says, is for the media to enter into a war with Trump, and forget its job. "There is one professional obligation," he told me. "To say things that are true." (For news readers, he recommends the articles on page 7.) The real subject of his book, he added, is that "it's very easy to be in a collective blindness." And the past can obscure the future. "Why didn't the correspondents in the thirties see Hitler? Because they thought he was a German Mussolini," Schneidermann said. "They said, O.K., we know Mussolini. They weren't actually looking at Hitler." In the book, he writes, "Every revolutionary process automatically produces denial. How can we accept the fact that, from now on, the order of things will be fundamentally different from what it always was?"

In recent years, a small group of scholars has focussed on war-termination theory. They see reason to fear the possible outcomes in Ukraine.

**By Keith Gessen**



Cookies Settings



*Society of Professional Journalists*

# CODE of ETHICS

## PREAMBLE

Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. Ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough. An ethical journalist acts with integrity.

The Society declares these four principles as the foundation of ethical journalism and encourages their use in its practice by all people in all media.

## SEEK TRUTH AND REPORT IT

Ethical journalism should be accurate and fair. Journalists should be honest and courageous in gathering, reporting and interpreting information.

Journalists should:

▸ Take responsibility for the accuracy of their work. Verify information before releasing it. Use original sources whenever possible.

▸ Remember that neither speed nor format excuses inaccuracy.

▸ Provide context. Take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story.

▸ Gather, update and correct information throughout the life of a news story.

▸ Be cautious when making promises, but keep the promises they make.

▸ Identify sources clearly. The public is entitled to as much information as possible to judge the reliability and motivations of sources.

▸ Consider sources' motives before promising anonymity. Reserve anonymity for sources who may face danger, retribution or other harm, and have information that cannot be obtained elsewhere. Explain why anonymity was granted.

▸ Diligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing.

▸ Avoid undercover or other surreptitious methods of gathering information unless traditional, open methods will not yield information vital to the public.

▸ Be vigilant and courageous about holding those with power accountable. Give voice to the voiceless.

▸ Support the open and civil exchange of views, even views they find repugnant.

▸ Recognize a special obligation to serve as watchdogs over public affairs and government. Seek to ensure that the public's business is conducted in the open, and that public records are open to all.

▸ Provide access to source material when it is relevant and appropriate.

▸ Boldly tell the story of the diversity and magnitude of the human experience. Seek sources whose voices we seldom hear.

▸ Avoid stereotyping. Journalists should examine the ways their values and experiences may shape their reporting.

▸ Label advocacy and commentary.

▸ Never deliberately distort facts or context, including visual information. Clearly label illustrations and re-enactments.

▸ Never plagiarize. Always attribute.

## MINIMIZE HARM

Ethical journalism treats sources, subjects, colleagues and members of the public as human beings deserving of respect.

Journalists should:

▸ Balance the public's need for information against potential harm or discomfort. Pursuit of the news is not a license for arrogance or undue intrusiveness.

▸ Show compassion for those who may be affected by news coverage. Use heightened sensitivity when dealing with juveniles, victims of sex crimes, and sources or subjects who are inexperienced or unable to give consent. Consider cultural differences in approach and treatment.

▸ Recognize that legal access to information differs from an ethical justification to publish or broadcast.

▸ Realize that private people have a greater right to control information about themselves than public figures and others who seek power, influence or attention. Weigh the consequences of publishing or broadcasting personal information.

▸ Avoid pandering to lurid curiosity, even if others do.

▸ Balance a suspect's right to a fair trial with the public's right to know. Consider the implications of identifying criminal suspects before they face legal charges.

▸ Consider the long-term implications of the extended reach and permanence of publication. Provide updated and more complete information as appropriate.

## ACT INDEPENDENTLY

The highest and primary obligation of ethical journalism is to serve the public.

Journalists should:

▸ Avoid conflicts of interest, real or perceived. Disclose unavoidable conflicts.

▸ Refuse gifts, favors, fees, free travel and special treatment, and avoid political and other outside activities that may compromise integrity or impartiality, or may damage credibility.

▸ Be wary of sources offering information for favors or money; do not pay for access to news. Identify content provided by outside sources, whether paid or not.

▸ Deny favored treatment to advertisers, donors or any other special interests, and resist internal and external pressure to influence coverage.

▸ Distinguish news from advertising and shun hybrids that blur the lines between the two. Prominently label sponsored content.

## BE ACCOUNTABLE AND TRANSPARENT

Ethical journalism means taking responsibility for one's work and explaining one's decisions to the public.

Journalists should:

▸ Explain ethical choices and processes to audiences. Encourage a civil dialogue with the public about journalistic practices, coverage and news content.

▸ Respond quickly to questions about accuracy, clarity and fairness.

▸ Acknowledge mistakes and correct them promptly and prominently. Explain corrections and clarifications carefully and clearly.

▸ Expose unethical conduct in journalism, including within their organizations.

▸ Abide by the same high standards they expect of others.

The SPJ Code of Ethics is a statement of abiding principles supported by additional explanations and position papers (at spj.org) that address changing journalistic practices. It is not a set of rules, rather a guide that encourages all who engage in journalism to take responsibility for the information they provide, regardless of medium. The code should be used as a whole; individual principles should not be taken out of context. It is not, nor can it be under the First Amendment, legally enforceable.

Exhibit 9




**DIVERSITY AND INCLUSIVENESS**
**WOMEN IN PHILOSOPHY**

# Tone-Policing and the Assertion of Authority

👤 By Alice MacLachlan

🗓 May 10, 2022    💬 No Comments






Exhibit 10

> Tone Policing is a *dangerous habit that has real psychosocial consequences*.

**CHANDRA PRESCOD-WEINSTEIN**

If tone policing is anything at all, then it is bad. This is pretty much a truism on and off the internet; the term is only ever used either pejoratively or sarcastically. No one defends themselves by saying, "well, *in this case*, it was justifiable tone policing" or "things were getting a little out of hand, but after some sensible and appropriate tone-policing we were able to move forward." Instead, you're more likely to hear denial: "that wasn't tone policing!" or "not *everything* is tone policing, you know…" Implicit in these responses is a normative claim: if what you're doing does count as tone policing, then you've already gone wrong.

Given that debates over the validity of tone-policing-*adjacent* interventions take the form of arguments about whether the

remark in question counts as such, it's useful to think clearly about the contours of the phenomenon – even if the resulting shape has fuzzy or even blurry edges. After all, tone policing pops up as a ubiquitous example of why demanding civility in discussions of oppression can be so dangerous and harmful – something that contributes to broader categories of harms like gaslighting, microaggression, and silencing. In these contexts, tone policing is typically described by its effects on the person being tone policed:

> Tone policing is when someone (usually a privileged person) in a conversation about oppression shifts the conversation from the oppression being discussed to the way it is being discussed. Tone policing prioritizes the comfort of the privileged person in the situation over the oppression of the disadvantaged person.

I happen to think this description is accurate and informative – that is, it gets at the substance of what it is to be tone-policed, and why it is so bad. In fact, Oluo's chapter on tone policing in _So You Want to Talk About Race_ is one of the clearest and most extensive discussions of the topic I've found.

But focusing on the effects of tone policing and on the context of oppression and unequal privilege can leave this type of explanation superficially vulnerable to accusations of circularity or unfairness, especially from those who reject the very idea of social oppression and privilege. Indeed, coupled with calls for those with race and gender privilege to "decenter" themselves and to not "make it about your feelings" it can – superficially if not actually – seem like the concept of tone-policing sets a double standard: angry feelings are welcomed – but only some people's and only some of the time.

It's not hard to imagine a skeptic complaining: "so what – if I express my feelings then it's white fragility, but if I tell someone else to calm down it's tone policing? This is an attack on my speech." While, on the one hand, I tend to think there is little merit in this kind of complaint, as it confounds very different conversational interventions, the objection is sufficiently familiar that some debunking is in order.

Let's consider some proto-typical instances of tone policing:

"Calm down. There's no point in engaging if you can't even have a civil conversation."

"I'm happy to discuss this rationally, but I'm not going to listen if you're going to yell."

"You'll catch more flies with honey than vinegar, you know. You're going to

"You'll catch more flies with honey than vinegar, you know. You're going to alienate allies if you're angry all the time."

"Look, I'm not the real enemy. There's no need to get so upset. Just explain what the actual problem is."

Of course, Audre Lorde describes it best in "The Uses of Anger":

> I speak out of direct and particular anger at an academic conference, and a white woman says, "Tell me how you feel but don't say it too harshly or I cannot hear you." But is it my manner that keeps her from hearing, or the threat of a message that her life may change?

At its core, tone-policing is first an argumentative move sideways and then a stall. It first shifts the focus from the *content* of the conversation to the *tone,*

*language,* or *manner* of discussion (as the quote above says) and then – unlike other interventions about tone – policing announces that the shift cannot be reversed until tone is addressed. The tone-policer doesn't just declare that their interlocutor's tone is inappropriate and heightened (usually because it is too hostile, adversarial, or aggressive, upset, or irrational). They insist that the conversation cannot continue until the speaker adjusts it. It often involves a further demand – implicit or explicit – that the interlocutor address their infraction with some apology or other gesture of accountability before things can proceed.

The term "policing" is crucial here, carrying implications of vested authority and the right to enforce one's judgment. Focusing on authority and enforcement is useful for distinguishing tone-policing from other interventions around tone. So, for example, I might offer a colleague feedback on a funeral address by

suggesting joking isn't appropriate or I might nudge a morose friend to smile at the brides on their wedding day. Decades ago, I trained in crisis intervention work, and much of the learning process involved cautioning trainees to adjust their instinctive responses – including, crucially, our tone. In other words, not all tone interventions are invalid; in a certain context and in light of our impact on others, we ought to revise our tone. There are, of course, broader questions to ask about conformity here and the extent to which managing our faces, voices, and emotional expressions according to social convention – is ableist and oppressive for neurodivergent folks and others whose social-emotional patterns and reactions may not match the neurotypical mainstream. But none of the examples I gave, even though some of them were directive, are tone-*policing*. Why not? Again, it comes down to an implicit claim of authority – both in judgment and in enforcement. And this is an exercise of

power.

In tone-policing someone's speech, the tone-policer asserts at least three things to the speaker:

1. Their tone is too angry, aggressive, adversarial, emotional, upset, or heightened for this conversational context, and this represents a sufficient violation for intervention.

2. The tone violation endangers the conversation at hand, while a lowered tone does not – i.e. the discussion can and will go better without the speaker's emotional expression.

3. The standard the speaker has violated is either the policer's own sense of comfort and safety, or their [rightful] sense of propriety or civility; this is too much according to *the policer* (as a personal boundary or as a broader norm) and that *too much* alone makes the remark a conversational violation for which the

conversational violation for which the speaker is accountable to the policer.

These aren't terribly controversial or revelatory. But what's not always explicit is that the tone policer is, in asserting these, making a claim to three different kinds of authority: conversational, epistemic, and emotional.

**Conversational authority:** the tone policer makes themselves the *source* of the authority to intervene and the *standard* by which the need for intervention is judged. By expressing emotion, the speaker has invalidated their claim to set conversational rules and, thus, made themselves subject to the policer's claim. The norms of conversation are no longer being mutually negotiated; they are legislated from one party to the other.

Tone policing is a redirection and a refusal, not simply an intervention. There

is no appeal to some mutually recognized external context (a funeral, a wedding, a crisis phone call) and the only reason offered is the tone policer's own subjective experience. *My* own sense that this is too angry for decent conversation – that is, my feelings of either discomfort or disapproval – become themselves sufficient warrant to act – a warrant that supercedes the need to talk about (for example) racism or sexism or other forms of oppression – or, in more mundane cases, the reasons there might be to listen to the speaker's perspective or experiences (i.e. their subjectivity). The ability to make oneself both the source and the standard for intervention is an assertion of conversational power, often tied to social identities like whiteness and masculinity.

**Epistemic authority:** the second claim – that the conversation can continue unabated in a different tone – has the effect of divorcing anger from its message

and leaving it free-floating as something problematic, and this in turn undermines the speaker's epistemic credibility. If we can be told *of* anger and reasons for anger without experiencing that anger, then any additional feeling of anger is unnecessary and – since unpleasant – therefore counterproductive. Alison Bailey describes "anger-silencing spirals" that becomes "tone vigilance"; for example, a Black woman's anger at racial injustice prompts a white woman to demand protection from that anger, refusing to hear the message. Each repetition of the angry message becomes, to the white woman, further evidence of the Black woman's unreasonableness, and more reason to deny her epistemic credibility, to refuse to hear her. It's a closed system that produces the very anger it then refuses to ultimately deny someone a voice.

**Emotional authority:** Finally, in judging that their present disapproval or

discomfort is more serious than whatever grievance the speaker has raised (including broader harms of social and political oppression) the tone policer asserts the authority to decide whose disapproval or discomfort takes priority – and does so without appeal to anything beyond the sheer fact of their own judgment.

This brings us back to the skeptic I mentioned earlier – and the difference between tone-policing and other conversational interventions. What is distinctive in tone-policing is not just that these three forms of authority are asserted, but that they are asserted as a form of self-standing authority, without further justification or appeal – it's taken as a given that the speaker's subjectivity and sense of comfort or propriety, even their own limitations ("or I cannot hear you," as Lorde's white woman remarks) are sufficient. This is nothing more than the exercise of power – and it is insidious

precisely because it is couched as an appeal to rules that both parties have accepted, rather than a demand that one person conform to the other's standards.

The tone policer takes it as natural or given that their subjective experience is an appropriate standard for conversation and warrant for conversational intervention. *This*, more than anything, is what makes the bracket in Ijeuma Oluo's definition so telling "(usually a privileged person)." Those of us with sufficient social privilege and power that we are used to *experiencing* ourselves as the standard are far more likely to assert this authority casually, without further explanation. Unlike an intervention that asks someone to decenter themselves ("listen – we're talking the effects of racist schooling on Black children – this isn't about you"), tone-policing offers no justification beyond the tone policer's subjectivity.

Moreover, tone policing or any approach

to conversational norms that takes as its standard and starting point the ideal of disinterested impartiality, will inevitably give the upper hand to the person who is able to appear most dispassionate about the topic, precisely because they are least (harmfully) impacted by it. The effects of this subtle prioritization are not just conversational; epistemic authority is conveyed, as is a dangerous model for what epistemic authority in difficult conversations *looks like*. If, in difficult conversations, we ought to speak and comport ourselves like someone who is unaffected by the subject as much as possible then, it is implied, there is something of value in *being* unaffected by the subject, something worth paying attention to.

In other words, tone-policing reproduces and reinforces the idea that the kinds of people who are *able* to tone-police are those who ought to be speaking, and setting the standards for who speaks,

how they speak, and what deserves to be heard. Much like other kinds of policing, the tone police do not just enforce the status quo, they create and maintain it. Tone-policing as a freestanding conversational intervention – as something that can be assumed and asserted without further justification – reveals the unequal terrain of the playing field they are refereeing.

I write this in a country that continues to uncover the mass graves of Indigenous children at the sites of former state-run residential schools. I write it on the day it became clear that millions of people with uteruses will soon lose their reproductive rights. An ongoing global pandemic which many insist no longer exists has only widened the wealth gap between rich and poor. On the one hand, this makes it hard to take seriously a blog post about the business of conversational niceties. On the other, there is clearly a great deal to be angry about, and many, many reasons

to raise our voices. In her excellent book, _The Case for Rage_, Myisha Cherry invites her readers to expand our concept of anger management – reminding us that management at its best does not diminish those who are managed, but brings out and develops their strongest qualities. Bringing out the best in our anger will require that it be articulated, amplified, and addressed – and not policed.

_Thanks to Barrett Emerick for helping me think through these ideas._

_The Women in Philosophy series publishes posts on women in the history of philosophy, posts on issues of concern to women in the field of philosophy, and posts that put philosophy to work to address issues of concern to women in the wider world. If you are interested in writing for the series, please contact the Series Editor Adriel M. Trott or the Associate Editor Alida Liberman._

From: **Rebecca Bibbs** rebecca.bibbs@heraldbulletin.com
Subject: **Fwd: Zoom Meeting**
Date: **May 18, 2021 at 4:01:03 PM**
To: **rbibbs@rocketmail.com**

**Rebecca R. Bibbs**
Reporter

765-640-4863

From: "Beverly Joyce" <beverly.joyce@indianamediagroup.com>
To: "Rebecca Bibbs" <rebecca.bibbs@heraldbulletin.com>
Cc: "Scott Underwood" <scott.underwood@heraldbulletin.com>, "Terrence Alexander" <talexander@cnhi.com>
Date: Tue, 18 May 2021 12:18:17 -0400
Subject: Zoom Meeting

Rebecca:

As you know, we postponed a meeting Scott and I wanted to have with you on expectations and protocol while you worked through some concerns with Terrence. Scott and I would like to revisit those issues at this time so we would like to schedule a Zoom call with you Thursday, May 20 at 3:30 EST.

The concerns we will discuss are the importance of: (1) reporting the news, rather than becoming the news by inserting yourself and your personal opinions directly into discussions between those upon whom you are reporting; and (2) the substance of your communications with others.

Scott, Terrence and I will meet with you by zoom this Thursday, May 20 at 3:30.

Scott will send us all a link for the meeting.

Thank you,
Bev

**Beverly Joyce**
Publisher

765-640-2307

www.theheraldbulletin.com

CONFIDENTIALITY NOTICE:
This E-mail and any attachments are confidential and may be protected by legal privilege. If you are not the

Exhibit 11

# MINUTES
## ANDERSON REDEVELOPMENT COMMISSION
## June 25, 2014

**PUBLIC HEARING**
4:30 p.m.
Conference Room #1
120 East 8th Street
Anderson, IN 46016

**MEMBERS PRESENT**
Justin Puckett, Vice President
Carolyn Scott, Secretary / Treasurer
Kevin Sulc, Member

**MEMBERS ABSENT**
Mike Farmer, President
Joe Royer, Member
Roger Clark, Non-Voting Member

**STAFF PRESENT**
Greg Winkler, Director
Ann Marie Bauer, Attorney
April Phillips, Financial Specialist
Levi Rinker, Downtown Specialist

**OTHERS PRESENT**
Mark Rowe, Wigwam Sports & Entertainment LLC.
Terry Thimlar, Wigwam Sports & Entertainment LLC.
Tom Moore, Vectren
Frank Burrows, City Hall Maintenance Superintendent
Terry Thompson, Anderson Community Schools
Larry Rittenhouse, Anderson Community Schools
Tom Bannon, Anderson/Madison County Visitors and Convention Bureau
Shanna Henry, Project Brewify
Ken de la Bastide, Herald Bulletin

**ROLL CALL AND DECLARATION OF QUORUM**
Mr. Puckett opened the public hearing at 4:32 p.m. and declared a quorum with three (3) members present.

**BUSINESS**
Mr. Winkler explained the issue before the Commission is the passing of the Wigwam property as donated by the Anderson Community School board to the Anderson Redevelopment Commission and from the Anderson Redevelopment Commission to the Wigwam Sports and Entertainment LLC.

Mr. Sulc asked for an assessment on their financial status.

Mr. Thimlar answered that they have met the requirement of their Private Placement Memorandum, which is the document the investors have signed and must be adhered to. With this being met, they are ready to move forward as far as taking the funds out of escrow and into an operating account. They are doing their due diligence such as obtaining insurance and inspections. They are ready to accept the property.

Mr. de la Bastide asked how important the $1 50,000 commitment and guaranteed use of the facility five times a year by the Anderson Community School Corporation was to the project.

Mr. Thimlar answered it was very important to the school and to the investors. This moved from dialogue to written commitment. It had a huge moral impact.

Mr. Bannon stated the school system, the City, and the Wigwam Sports and Entertainment, LLC. have worked very hard to make this a reality. He commended everybody for working together. From the Visitors Bureau standpoint, the community has some very good attractions and this is yet another facility to promote and bring visitors in. He is excited about the proposed camps. Camps result in hotel stays which also result in eating at restaurants and purchasing items such as gasoline. Economic development will be spurred by this project. The Wigwam is a community identifier and needs to be kept if possible. This is a win win win. This reminds him of the early 1990s when the Paramount Theater was being renovated. It is hard to image this community icon not being here. The restoration of the Paramount brought back

Exhibit 12

excitement and pride in the community and he sees this happing with the Wigwam. This could be a catalyst to a lot of great things. He commended everybody for working hard and keeping a professional dialogue throughout the whole process.

Mr. Winkler stated one of the discussions over the last few weeks was how to make the best use of the classroom, vocational, and theater space. There has been dialogue about having a Winterfest event in the Wigwam. They are looking at plugging in the arts and artists to make use of the entire space, not just the gym.

Ms. Henry stated the Wigwam was the first building to come to mind for a Winterfest. The reaction from the community to the Brewfest was overwhelming with gratitude and wanting to do more similar events. The Wigwam fits the mold of a Midwest event to showcase 30-40 brewers from Indiana, Ohio, Illinois, Missouri, etc. The artists' Incubator is a great idea. The arts community is trying to collaborate and form an alliance and the Wigwam could help to house something of this type. It means a lot to her to that they are trying to save the Wigwam.

Mr. Rinker explained that he met with the Indiana Black Expo today and they are interested in holding their basketball tournament in the Wigwam.

Mrs. Scott stated that at the last meeting she was concerned about the inclusion of the citizens of Anderson in this process. She is very thrilled with what she has learned since that time. Anderson will be well served by this project.

Mayor Smith appreciated the work of everybody involved in the project.

The public hearing was closed at 4:46.

## ROLL CALL AND DECLARATION OF QUORUM

Mr. Puckett called the meeting to order at 4:46 p.m. and declared a quorum with three (3) members present.

## BUSINESS

**Resolution ARC07-14 Acceptance of the Ownership from the Anderson Community School Corporation for Property Known as**

**the Wigwam**
Mrs. Bauer explained that by Indiana Code the Commission is authorized to accept donations, purchase, and acquire property in a variety of manners. The Anderson School Corporation has authorized the transfer of certain property and this is exactly the same property. They have also passed two resolutions associated with that transfer. The Commission has determined that they will accept title to the Wigwam facility not later than July 8 which is also the deadline set by the Anderson School Corporation upon agreement by the Wigwam Sports and Entertainment, LLC. to accept immediate transfer of title to the Wigwam Sports and Entertainment, LLC. The Commission has been assured, and she looked at Mr. Thimlar and he concurred, that the Wigwam Sports and Entertainment, LLC. will accept the property exactly as donated by the Anderson Community School Corporation.

Mr. Puckett mentioned that the Commission received the resolutions electronically and they have all reviewed them.

Mr. Sulc moved to approve Resolution #ARC07-14. Mrs. Scott seconded. Motion passed unanimously; 3 yes, 0 no.

**Resolution ARC08-14 Transfer of Ownership of Wigwam to Wigwam Sports and Entertainment, LLC.**
Mrs. Bauer explained this is the other side of the transaction. The resolution authorizes the transfer of the real estate to the Wigwam Sports and Entertainment, LLC. Within the Indiana statute, there is provision allowing transfer of property at no less than appraised value when property is not in a redevelopment area and not needed for a redevelopment project. This property is not in a redevelopment area. The appraisals came in at less than zero based on the net appraised value considering the demolition of the building which is a viable alternative. With all conditions being met, the Wigwam Sports and Entertainment, LLC. agrees to accept the identified property exactly as donated to the Commission so this a complete transfer. This transfer is contingent upon the first. The transfer of title will be completed no later than July 8. Both resolutions are tied together. Currently the closings on the transactions are set to occur within one hour of each other so this will be a sequential closing transaction.

Mrs. Scott moved to approve Resolution ARC08-14.
Mr. Sulc seconded. Motion passed unanimously; 3
yes, 0 no.

## MISCELLANEOUS

## ADJOURNMENT
Mr. Sulc moved to adjourn. Mrs. Scott seconded.
Meeting adjourned at 5:06 p.m.

# MINUTES
## ANDERSON REDEVELOPMENT COMMISSION
## January 12, 2021

**PUBLIC MEETING**
5:00 p.m.
Via Zoom Conferencing

**MEMBERS PRESENT**
Richard Symmes, President
Danny McGhee, Vice President
Aspen Clemons, Secretary
David Eicks
Kenneth Davenport

**STAFF PRESENT**
Greg Winkler, ED Director
Karen Soetenga, Specialist
Mike Austin, Commission Attorney

**OHTERS PRESENT**
Doug Whitham, City Controller
Darren Grile, Anderson Light and Power
Chuck Leser, City Engineer
Neal McKee, Water Superintendent
Lori Young, Design Engineer, Courier and Assoc
Ken DeLabastide, Herald Bulletin
Anikka King, City of Anderson
Lindsay Brown, Citizen

**OPEN PUBLIC MEETING**

**ROLL CALL AND DECLARATION OF QUORUM**
Mr. Symmes, at 5:02 pm., established a quorum with five (5) members present.

**ELECTION OF OFFICES**
Mr. Symmes opened the nominations for President. Ms. Clemons nominated Mr. McGhee. Mr. Davenport nominated Mr. Symmes. Nominations were closed. Mr. Symmes called for a vote on Mr. McGhee to serve as president for 2021. The vote was 2 yes. Mr. Symmes called for a vote for Mr. Symmes continuing as president for 2021. The vote was 3 yes. Mr. Symmes will continue as Commission president for 2021.

Mr. Symmes opened the nominations for Vice President. Mr. Symmes nominated Mr. McGhee. Mr. Symmes asked twice for any other nominations, there were none Nominations were closed. Mr. McGhee was elected Vice President: 5 yes, 0 no.

Mr. Symmes opened the nominations for Secretary. Mr. Eicks nominated Ms. Clemons. Mr. Symmes asked twice for any other nominations, there were none. Mr.

Symmes closed nominations. Ms. Clemons was elected Secretary Treasurer: 5 yes, 0 no.

**LEGAL COUNSEL**
Mr. McGhee nominated Mr. Michael Austin as legal counsel to the Commission for 2021. Mr. Davenport seconded. Mr. Austin was named legal counsel; 5 yes, 0 no.

**MINUTES**
Mr. McGhee moved to approve the December 15, 2020 and December 17, 2020 minutes. Mr. Davenport seconded. Motion passed unanimously; 5 yes, 0 no.

**FINANCIALS / INVOICES**
Commission members reviewed financials and invoices.

Ms. Soetenga stated invoices totaled $225,791.43. Brief discussion followed. Mr. Eicks moved to approve the invoices as submitted. Mr. Davenport seconded. Motion passed unanimously; 5 yes, 0 no.

**BUSINESS**

**Update on MLK and 73 rd Street Improvements**
Mr. Winkler introduced Mr. Leser, City Engineer, to provide an update on MLK and 73rd Street improvements. Mr. Leser informed members of project costs: 2019 Asphalt Resurfacing, $2,002,013.75, 2020-21 Concrete Resurfacing $2,549,474.00 with ARC pledging up to 4.7M. Discussion followed. Mr. Leser stated work will pick back up in the spring and should be completed within 60 days. Mr. Leser showed members pictures of different phases.

**Request for the drilling of two replacement wells in Lafayette Wellfield**
Mr. Winkler introduced Mr. McKee, Water Superintendent. Mr. McKee briefed members on request for the funding of two replacement wells in Lafayette Wellfield. Mr. McKee stated they will support the new treatment plant on north side of the City and are part of 4 well replacements that were to be completed in 2018 but, due to budget restraints, were put on hold. Completing the project is a critical step in increasing well house and plant capacity. Mr. McKhee stated the old wells are 40 plus years old and have lost nearly 70% of their capacity. Mr. Winkler stated cost is estimated at $1,193,000. Discussion followed.

Mr. DeLaBastide asked when the project was expected to be completed. Ms. Young, project engineer, stated they could get the wells on line by the end of 2021 if all goes well. Discussion followed.

Mr. Eicks made a motion to commit $1,193,000 to the drilling of two replacement wells in Lafayette Wellfield and Mr. McGhee seconded. Motion passed unanimously; 5 yes, 0 no.

Mr. McGhee offered congratulations to Mr. Symmes for being elected president and stated he was disheartened being vice president for three years when in the past the Commission has had succession to the chair and expressed hope moving forward there could be a rightful succession to the chair.

Ms. King, City of Anderson, stated in redevelopment guidelines there is opportunity for individual homeowners to utilize redevelopment funds to improve their homes and asked if there are plans to offer such funds and if not when can a conversation take place. Mr. Winkler stated Mr. Austin, Commission Attorney, could provide information for what the Commission can and cannot do. He stated his understanding is statute allows for certain things but did not know if there is language allowing funding to private homeowners. Mr. Symmes asked Mr. Austin to report back at the next meeting. Discussion followed.

Mr. Brown, citizen, complimented Mr. McGhee in having patience as he has held the Vice President's position for three years. Mr. Symmes stated Mr. McGhee had his say and asked for an adjournment of the meeting.

Meeting was adjourned at 5:32pm.

# Rebecca Bibbs' Production Chart

This chart tracks Rebecca R. Bibbs' production by the number of articles, not icluding jail logs generated in a particular month.
Up until 2019, Bibbs more than met the directive to produce seven stories for every five days of work, roughly 28 articles a month,
not including vacation and sick time. The production dropped temporarily after managemnt approached Bibbs about LIndsay
Brown and permanently afyer she was approached about him again in February 2021, signifying the distress experienced by Bibbs.

| | 2022 | 2021 | 2020 | 2019 |
|---|---|---|---|---|
| January | 14 | 23 | 32 | 34 |
| February | 25 | 30 | 36 | 25 |
| March | 21 | 24 | 34 | 46 |
| April | 25 | 24 | 25 | 32 |
| May | 26 | 25 | 30 | 39 |
| June | 19 | 24 | 36 | 32 |
| July | 21 | 15 | 38 | 29 |
| August | 26 | 30 | 28 | 39 |
| September | 11 | 20 | 21 | 35 |
| October | 16 | 23 | 21 | 42 |
| November | | 11 | 32 | 38 |
| December | | 23 | 24 | 26 |

*These are publication dates and may not reflect that some articles actually may have been written the prior month.

Exhibit 13

September 12, 2022

# Third Party Harassment Claims: When the Customer is Wrong

Heather Garrison

Spilman Thomas & Battle, PLLC

( + Follow )  ( Contact )



Most employers know that they have a legal obligation to protect employees from harassment at work and to prevent it from recurring. Many employers assume that this obligation relates to harassment by employees and managers; however, it actually extends to harassment by third parties, including customers or vendors. Several recent cases brought by the U.S. Equal Employment Opportunity Commission ("EEOC") reinforce the concept that employers ca[...]  [...]t of third parties if the employer knew or should [...]d to take timely remedial measures.

In one case, a gas station and convenience store operator recently agreed to pay $75,000 and furnish other relief to settle a lawsuit brought by the EEOC for failure to prevent sexual harassment of an employee by a customer. According to the complaint, a female employee was subjected to months of sexual advances and crude jokes by a male customer. The employee reported the customer's conduct to management – as did other employees and customers – but the company failed to act promptly to stop the harassment.

It is important to note that under the gas station's policy, the employee could report harassment to a department manager, to Human Resources, to a company hotline, or to "to any member of management." While it is important to have multiple avenues for an employee to report harassment, allowing an employee to report to "any member of management" can pose an issue unless those members of management are properly

Exhibit 14

trained on how to respond to such complaints. Employers should ensure that persons who are identified as able to receive reports of harassment and discrimination under company policy are properly trained on their legal obligations, including the obligation to respond promptly and effectively.

In another case brought by the EEOC, a jury found Costco liable for failing to stop a customer's harassment. The facts revealed – as uncovered through Costco's own investigation – that the employee was being stalked by a customer. Costco, however, was slow to act because it did not deem the behavior "overtly sexual." The jury verdict was upheld on appeal with the Court of Appeals holding that the employer acted unreasonably in failing to separate the employee (who reported feeling fear and intimidation) from her stalker. Importantly, the Court also found that harassment need not be sexual to be "based on sex" as required to state a claim under Title VII. These cases illustrate that employers must take seriously allegations of all forms of harassment, including from third persons. In addition, the longer an employer waits to investigate and take corrective action, the greater the risk for exposure. The employer's obligation is always to timely investigate and take prompt remedial action.

**Practical Tips for Employers for Dealing with Harassment by Third Parties**
Ensure that your harassment policy covers harassment by third parties, including customers, clients, contractors, and vendors. Make sure employees know how to bring forth complaints against these third parties. Remember, an employer is liable for harassment by a third party when it knew or should have known of the conduct and failed to take timely remedial measures.

1. For third parties such as vendors, independent contractors, and consultants, make sure they are familiar with the employer's policies against harassment and discrimination. An employer has the right to bar such third parties from the property if they are harassing or discriminating against employees.

2. Consider a harassment policy that goes beyond legally protected conduct to include any type of offensive conduct. Inappropriate conduct that may not rise to the level of actionable harassment should still be brought to the employer's attention and remedied.

3. Train managers on how to recognize harassment and establish a clear procedure on how to respond. Claims of harassment by third parties should be treated the

trained on how to respond to such complaints. Employers should ensure that persons who are identified as able to receive reports of harassment and discrimination under company policy are properly trained on their legal obligations, including the obligation to respond promptly and effectively.

In another case brought by the EEOC, a jury found Costco liable for failing to stop a customer's harassment. The facts revealed – as uncovered through Costco's own investigation – that the employee was being stalked by a customer. Costco, however, was slow to act because it did not deem the behavior "overtly sexual." The jury verdict was upheld on appeal with the Court of Appeals holding that the employer acted unreasonably in failing to separate the employee (who reported feeling fear and intimidation) from her stalker. Importantly, the Court also found that harassment need not be sexual to be "based on sex" as required to state a claim under Title VII. These cases illustrate that employers must take seriously allegations of all forms of harassment, including from third persons. In addition, the longer an employer waits to investigate and take corrective action, the greater the risk for exposure. The employer's obligation is always to timely investigate and take prompt remedial action.

**Practical Tips for Employers for Dealing with Harassment by Third Parties**
Ensure that your harassment policy covers harassment by third parties, including customers, clients, contractors, and vendors. Make sure employees know how to bring forth complaints against these third parties. Remember, an employer is liable for harassment by a third party when it knew or should have known of the conduct and failed to take timely remedial measures.

1. For third parties such as vendors, independent contractors, and consultants, make sure they are familiar with the employer's policies against harassment and discrimination. An employer has the right to bar such third parties from the property if they are harassing or discriminating against employees.

2. Consider a harassment policy that goes beyond legally protected conduct to include any type of offensive conduct. Inappropriate conduct that may not rise to the level of actionable harassment should still be brought to the employer's attention and remedied.

3. Train managers on how to recognize harassment and establish a clear procedure on how to respond. Claims of harassment by third parties should be treated the

same as claims of harassment by a co-employee. Make sure managers know what steps they need to take upon learning of such third-party harassment.

( ✉ Send )  ( 🖨 Print )  ( ⚠ Report )

---

## LATEST POSTS

- **Energy Industry Insights: V 7, Issue 2, January 2023**

- **The Evolution of Biometric Data Protection Bills – Updates from Maryland and Mississippi**

- **The Omnibus Bill and the Cybersecurity Investment**

- **Amazon's Billion Dollar Data Center Plans for Virginia**

- **Decoded: Technology Law Insights - V 4, Issue 1, January 2023**

See more »

---

DISCLAIMER: Because of the generality of this update, the information provided herein may not be applicable in all situations and should not be acted upon without specific legal advice based on particular situations.

© Spilman Thomas & Battle, PLLC 2023 | Attorney Advertising

---

**WRITTEN BY:**


Spilman Thomas & Battle, PLLC

 Contact  ( + Follow )

 Heather Garrison  ( + Follow )

**PUBLISHED IN:**

Anti-Harassment Policies  ( + Follow )